# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NEW ENTERPRISE ASSOCIATES 14, L.P., NEA VENTURES 2014, L.P., NEA:SEED II, LLC, and CORE CAPITAL PARTNERS III, L.P., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2022-0406-JTL |
| GEORGE S. RICH, SR., DAVID RUTCHIK, JOSH STELLA, FUGUE, INC., GRI VENTURES, LLC, JMI FUGUE, LLC, RICH FAMILY VENTURES, LLC, and RUTCHIK DESCENDANTS' TRUST, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION DENYING MOTION TO DISMISS BASED ON COVENANT NOT TO SUE FOR BREACH OF FIDUCIARY DUTY

Date Submitted: January 24, 2023
Date Decided: May 2, 2023

C. Barr Flinn, Paul J. Loughman, Michael A. Carbonara, Jr., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Michele D. Johnson, LATHAM & WATKINS LLP, Orange County, California; Eric Leon, Nathan Taylor, Meredith Cusick, LATHAM & WATKINS LLP, New York, New York; *Attorneys for Plaintiffs*.

John P. DiTomo, Sebastian Van Oudenallen, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington Delaware; Patrick Montgomery, Paul Weeks, KING & SPALDING LLP, Washington, District of Columbia; *Attorneys for Defendants*.

**LASTER, V.C.**

This decision grapples with a conflict between two elemental forces of Delaware corporate law: private ordering and fiduciary accountability. Ordinarily, those forces operate harmoniously. Here, they pull in opposite directions.

Viewed from the standpoint of private ordering, this might seem like an easy case for contract enforcement: Sophisticated stockholders granted another investor a contract right to engage in a transaction that met specified criteria, and they promised not to sue the investor or its affiliates and associates if the investor exercised that right. The investor committed capital to the corporation in reliance on the stockholders' promise. Later, the investor exercised its contract right. Now, the stockholders are doing what they said they wouldn't do: sue over the transaction.

But like an Escher lithograph, the image changes with the viewer's perspective. The claims that the stockholders promised not to assert include claims for breach of fiduciary duty. The investor became the corporation's controlling stockholder, and individuals affiliated or associated with the investor took over the board of directors. The stockholders contend that by engaging in the contractually authorized transaction, the investor and the directors breached their duty of loyalty. In contrast to Delaware's alternative entity statutes, the Delaware General Corporation Law (the "DGCL") permits only limited fiduciary tailoring. Viewed from the standpoint of fiduciary accountability, this might seem like an easy case for contractual invalidity.

With the stage set, let's dig in. The plaintiffs are investment funds (the "Funds") managed by sophisticated venture capital firms. The Funds invested in a startup company called Fugue, Inc. (the "Company"). After backing the Company for half-a-dozen years,

the Funds encouraged management to seek a liquidity event. The Company spent six months looking for a buyer, but no one expressed interest. After declaring the sale process a failure, the Company needed capital.

The Funds did not want to increase their financial commitment. Management represented that the only option was a recapitalization led by George Rich (the "Recapitalization"). He would only commit if (i) all existing preferred stock became common stock, (ii) Rich and his fellow investors received a new class of preferred stock (the "Preferred Stock"), and (iii) the Funds and other significant investors executed a voting agreement (the "Voting Agreement" or "VA"). The Funds accepted Rich's terms. They were given the chance to participate in the Recapitalization, but they declined.

The Voting Agreement contains a drag-along right. It provides that if the Company's board of directors (the "Board") and the holders of a majority of the Preferred Stock approve a transaction that meets a list of eight criteria, then the signatories must participate (the "Drag-Along Sale"). Critically for this case, the signatories covenanted not to sue Rich or his affiliates or associates over a Drag-Along Sale, including by asserting claims for breach of fiduciary duty (the "Covenant").

An opportunity to sell the Company soon materialized. The Company and the acquiror negotiated a Drag-Along Sale. That transaction has now closed.

In Counts VI, VII, and VIII of their complaint (the "Sale Counts"), the Funds have challenged the Drag-Along Sale and asserted claims for breach of fiduciary duty. The defendants argue that in light of the Covenant, the Sale Counts must be dismissed.

The Funds acknowledge that the Covenant covers their claims, and they concede that it was an inducement for Rich to invest. They assert that the Covenant is facially invalid.

The argument for facial invalidity starts from the settled proposition that fiduciary relationships are creatures of equity. The key move comes next and asserts that equity does not countenance limitations on fiduciary duties except to the extent authorized by statute. The DGCL does not authorize a provision like the Covenant. Therefore, the argument goes, it is contrary to Delaware public policy and cannot be enforced.

The argument against facial invalidity takes longer to unspool. It starts by recognizing that fiduciary duties can be tailored, even without statutory authorization. At the heart of every fiduciary relationship is an obligation of loyalty that cannot be eliminated without destroying its fiduciary character. Parties can, however, orient the obligation by specifying a purpose for the relationship, and they can authorize the fiduciary to take specific actions that otherwise would constitute a breach. Two paradigmatic fiduciary relationships—that of trustee to beneficiary and agent to principal—exemplify those opportunities for tailoring.

The argument next shows that Delaware corporate law adheres to those longstanding principles. The DGCL permits corporate planners to orient the fiduciary relationship between the directors and the corporation and its stockholders through a purpose clause. The directors must pursue the corporate purpose selflessly for the benefit of the corporation and its stockholders, but they are limited to pursuing the corporation's purpose. They cannot pick another path simply because they prefer it. The DGCL also

3

allows more space for fiduciary tailoring and greater limits on fiduciary accountability than is widely understood. Delaware common law goes further, with existing doctrines achieving outcomes comparable to what the Covenant contemplates.

Having shown that corporate fiduciary duties are not immutable, the argument against facial invalidity turns to the contractarian nature of Delaware corporate law. A close analysis of the DGCL shows that through a private agreement, stockholders can agree to more constraints on their ability to exercise stockholder-level rights than corporate planners can impose through the charter or bylaws. The Covenant appears in a stockholder-level agreement and concerns a stockholder-level right.

This in-depth analysis indicates that the Covenant is not out of bounds as a form of fiduciary tailoring. The analysis next turns to other indications of where Delaware might draw a public policy line.

An intuitively appealing argument asserts that a claim for breach of the duty of loyalty is too big to waive. One way to evaluate that argument is to consider what else is waivable. Delaware law permits individuals to waive significant liberty and property interests that are arguably weightier than a right appurtenant to a share. The comparison suggests that the Covenant is not facially invalid.

A rhetorically powerful argument asserts that permitting stockholders to covenant not to sue for breach of the duty of loyalty would conflict with Delaware's corporate brand, which promises standardized terms, including an immutable duty of loyalty. The promise of standardized terms should not be overstated, because Delaware's support for private ordering means that an investor cannot assume that one Delaware corporation is like

4

another. The promise of an immutable duty of loyalty is also overstated, because the duty can be oriented and tailored. Regardless, a stockholder-level agreement about the exercise of stockholder-level rights does not undermine the corporate brand, because the underlying rights remain intact. Each stockholder receives the underlying rights and can exercise them. The stockholder-level agreement only binds its signatories and only affects how they exercise their rights.

Another rhetorically powerful argument asserts that permitting a stockholder to covenant not to sue for breach of the duty of loyalty will collapse the distinction between a corporation and an LLC. That is not so, as the fundamental differences between corporations and LLCs operate at the basal level of their statutes and constitutive documents. There is a superficial similarity between the ability of investors in corporations and LLCs to contract about their investor-level rights, but that resemblance does not turn corporations into LLCs.

A final argument for invalidity relies on the Delaware Supreme Court's decision in *Manti Holdings, LLC v. Authentix Acquisition Co.*[1] There, sophisticated stockholders agreed to a drag-along provision in which they covenanted not to pursue their appraisal rights. The stockholders sought to escape their promise by arguing that the provision conflicted with the DGCL and was contrary to Delaware public policy.

---

[1] 261 A.3d 1199 (Del. 2021).

5

A majority of the Delaware Supreme Court upheld the appraisal waiver, stressing the contractual freedom that Delaware corporate law provides and citing a list of factors that apply equally to this case. But the justices also emphasized that they were not upholding all waivers of appraisal rights, and they admonished that Delaware law might not permit a stockholder to waive other rights. A dissenting justice would not have upheld the appraisal waiver.

The majority and dissenting opinions in *Manti* raise questions about whether a provision like the Covenant goes too far. This decision's review of trust law, agency law, the DGCL, and Delaware common law reveals that each authorizes provisions that allow fiduciaries to engage in specific transactions that otherwise would constitute a breach. The Covenant is sufficiently specific because it only applies to a transaction that meets the eight criteria required for a Drag-Along Sale. The Funds did not broadly covenant not to assert any claims for breach of fiduciary duty. They agreed not to sue over a specific transaction with specific characteristics.

The Covenant is therefore not facially invalid. It is also not invalid on the facts of the case. In *Manti*, the Delaware Supreme Court considers a series of factors, including (i) the presence of a written contract, (ii) the clarity of the waiver, (iii) the stockholder's understanding of the waiver's implications, (iv) the stockholder's ability to reject the provision, (v) the existence of bargained-for consideration, and (vi) the stockholder's sophistication. The proponent of the provision must establish that enforcement is reasonable.

6

This case provides an optimal scenario for enforcement. The Covenant appears in the Voting Agreement. It is a clear and specific. The Funds are sophisticated repeat players who understood its implications. It tracks a provision that appears in a model agreement sponsored by the National Venture Capital Association (the "NVCA"), and one of the venture capital firms behind the Funds is a member of the NVCA. The Covenant was part of a bargained-for exchange that induced Rich to lead the Recapitalization, his fellow investors to participate, and Rich and his colleague to serve on the Board. The Funds were the dominant incumbents in the cap table. If they did not like the Recapitalization, they could have blocked it, forced the Company to seek different terms, or funded the Company themselves. If they saw no alternative but thought Rich had secured a great deal, then they could have joined the investor group. They decided to pass, agreed to the Covenant, and let Rich and his investor group take the risk.

This decision cannot conclude that the Covenant is invalid as applied to these facts. That does not mean that the Delaware courts will enforce similar provisions. A covenant not to sue resembles another powerful provision: the covenant not to compete. Like a covenant not to sue, sophisticated parties can use a covenant not to compete to create value, but covenants not to compete can be abused, and this court examines them closely.

Parties should expect a similar hard look for covenants not to sue. A broad waiver of any ability to assert claims for breach of fiduciary duty would be a non-starter. Even a narrowly tailored provision would likely be unreasonable if it appeared in an agreement that purported to restrict the rights of retail stockholders.

7

Although the Covenant is not wholly invalid, either facially or as applied, its scope still stretches beyond what Delaware law allows. Delaware law generally prohibits contractual provisions that purport to exculpate a party for tort liability resulting from intentional or reckless harm. Delaware corporate law is more permissive and treats recklessness as a form of gross negligence, thereby expanding the power to exculpate to encompass recklessness. There is only one situation where Delaware law has gone further and held that a provision restricting tort liability for intentional harm was not facially invalid: In *Abry Partners*,[2] this court permitted a sophisticated party to disclaim reliance on any representations that did not appear in a written contract, thereby covenanting not to sue for extracontractual fraud. Subsequent decisions have refused to authorize other types of provisions that could restrict tort liability for intentional harm.

The Covenant purports to bar all challenges to the Drag-Along Sale. It cannot insulate the defendants from tort liability based on intentional wrongdoing, but it can protect against other claims. The Sale Counts rely on facts supporting an inference that the defendants could have acted intentionally and in bad faith to benefit themselves and harm the common stockholders during the lead up to the Drag-Along Sale. The Sale Counts therefore cannot be dismissed at the pleading stage. The defendants' motion to dismiss based on the Covenant is denied.

---

[2] *See Abry P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1057–59 (Del. Ch. 2006). The Delaware Supreme Court subsequently endorsed that innovation. *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 119 (Del. 2012).

## I. FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents that it incorporates by reference.[3] The defendants argued that the complaint failed to state a claim on which relief could be granted for reasons other than the Covenant, and the court issued an opinion addressing those contentions (the "Pleading Decision").[4] The Sale Counts survived dismissal, necessitating consideration of the Covenant. This decision incorporates the factual background from the Pleading Decision and only summarizes the information pertinent to the Covenant.

### A. The Company

Founded in 2012, the Company provides tools to build, deploy, and maintain a cloud infrastructure security platform. Josh Stella served as its Chief Executive Officer.

In 2013, plaintiff Core Capital Partners III, L.P. ("Core Capital") led the Company's seed round. Core Capital is an investment fund sponsored by Core Capital Partners, a venture capital firm based in Washington, D.C.

In 2014, plaintiffs New Enterprise Associates 14, L.P., NEA Ventures 2014, L.P., and NEA: Seed II, LLC, invested in the Company. Each is an investment fund sponsored

---

[3] Citations in the form "Ex. __" refer to documents attached to the Affidavit of Sebastian Van Oudenallen, which collects documents operated by reference in the operative complaint. Dkt. 14. Citations in the form "VA § __" refer to provisions in the Voting Agreement. Ex. 1 at Ex. E.

[4] *New Enter. Assocs. 14, L.P. v. Rich*, — A.3d —, 2023 WL 2417271, at *1 (Del. Ch. Mar. 9, 2023).

9

by New Enterprise Associates, a name-brand venture capital firm. The term "Funds" refers to the entities sponsored by NEA and Core Capital that invested in the Company.

Over multiple financing rounds, the Funds invested almost $39 million in the Company. In return, they received shares of preferred stock that carried special rights. Each of the Funds also received the right to appoint one member of the Board.

## B.       The Failed Sale Process And The Recapitalization

By 2020, Core Capital had been invested in the Company for seven years, and NEA had been invested for six. Those investments were getting long in the tooth.

The Funds urged Stella to seek a liquidity event. Starting in the second half of 2020, the Company sought a buyer.

Toward the end of the first quarter of 2021, Stella told the Board that the effort had failed. Stella represented that the Company needed capital, and he recommended that the Company engage in the Recapitalization. The Board authorized him to proceed.

## C.       The Terms Of The Recapitalization

In the Recapitalization, the Company raised roughly $8 million by issuing shares of Series A-1 Preferred Stock (the "Preferred Stock") to Rich and his investor group. Rich invested through two vehicles, one of which was designated as the "Lead Investor" under the transaction agreements. Rich controlled the investment vehicles through a third entity. All three entities are defendants (together, the "Rich Entities").

Twenty-three other investors participated in the Recapitalization. Eleven already owned common stock in the Company. Another five were Company employees. Only seven appear to be new investors. The Funds declined to participate.

10

The terms of the Recapitalization were onerous for the incumbent stockholders. Rich insisted that all of the preferred stock convert into common stock and that key stockholders execute the Voting Agreement. All of the investors in the Recapitalization executed the Voting Agreement, as did twenty-nine of the existing stockholders (the "Signatories"). The Funds were Signatories.

In the Voting Agreement, the Signatories agreed to vote for (i) one director designated by the Lead Investor, (ii) a second director designated by the holders of a majority of the Preferred Stock, (iii) a third director elected by a majority of the Preferred Stock held by investors other than the Lead Investor, (iv) the CEO, and (v) one director designated by all the outstanding stock voting together as a single class. After the Recapitalization, the Board's five members were Stella, two independent directors who carried over from before the Recapitalization, and two representatives of the new investors. Rich joined the Board as the designee of the Lead Investor. David Rutchik joined as the director designated by the holders of a majority of the Preferred Stock. Rutchik had participated in the Recapitalization through his affiliate, the Rutchik Descendants' Trust (the "Rutchik Trust").

Importantly for this decision, Section 3.2 of the Voting Agreement contains the Drag-Along Right. That provision obligates the Signatories to support a Drag-Along Sale and includes the Covenant.

11

**D.     An Expression Of Interest And The Interested Transactions**

In late June 2021, a potential acquirer contacted Stella. The outreach contrasted with the Company's failed sale process. The contact was preliminary, but it put a different cast on the Company's situation.

On July 14, 2021, the two independent directors resigned, leaving Stella, Rich, and Rutchik as the only members of the Board. One week later, they authorized the Company to issue another 3,938,941 shares of Preferred Stock. The buyers were nine entities and individuals, including the Rich and Rutchik. Rather than treating the issuance as a new transaction, the Board amended the terms of the Recapitalization and pretended that the second issuance was part of the original deal. That move enabled the buyers to acquire the shares at the same price and on the same terms that Rich had extracted in April 2021 when the Company was low on cash and had no alternatives.

Later that same month, on July 29, 2021, the Board approved grants of stock options. Many of the recipients were Company employees, but large grants went to the three directors.

The Funds contend that the second issuance of Preferred Stock and the grants of options to the insiders (together, the "Interested Transactions") constituted breaches of fiduciary duty. They allege that the Interested Transactions were obvious instances of self-dealing on terms that appear facially unfair to the Company and highly beneficial to Rich and his confederates.

12

**E.      The Merger**

While those events were transpiring, discussions with the acquirer moved forward. By September 2021, they were negotiating a merger agreement. In December, the Board told the stockholders about an agreement in principle to sell the Company for $120 million in cash.

On February 12, 2022, the Company sent the Funds a draft merger agreement with a joinder agreement and voting form. The Company told the Funds that they were obligated to sign the joinder agreement and voting form.

Section 1.1 of the joinder agreement bound each signatory to vote in favor of the merger and against any competing proposal. In Section 1.2 of the joinder agreement, each signatory released any and all claims against the Company, the directors, and their associates and affiliates.

The Funds agreed to sign the documents if Stella and Rich attested that they had not had any communications with the acquirer about a potential transaction before the Recapitalization. Their counsel promised to provide the affirmations.

On February 17, 2022, the Company announced that it had executed the merger agreement and closed the transaction. On February 18, 2022, Stella and Rich's counsel proposed substantially narrower affirmations. The Funds refused to sign the joinder agreement and voting form. On February 21, the Company circulated a distribution waterfall that revealed the Interested Transactions.

13

**F.     This Litigation**

On May 9, 2022, the Funds filed this lawsuit. The complaint contained eight counts, three of which comprise the Sale Counts. Count VI contends that Rich, Rutchik, and Stella breached their fiduciary duties as directors by approving the Drag-Along Sale. Count VII contends that the Rich Entities breached their fiduciary duties as controlling stockholders by approving the Drag-Along Sale. Count VIII alleges that the Rutchik Trust aided and abetted the fiduciaries' breaches of duty. The gist of those claims is that the Drag-Along Sale (i) failed to provide any consideration for derivative claims relating to the Interested Transactions and (ii) conferred a unique benefit on Rich, Rutchik, Stella, and their affiliates by extinguishing the standing of sell-side stockholders to pursue those claims. The Funds contend that the Drag-Along Sale was therefore an interested transaction subject to the entire fairness test and that the defendants cannot establish that it was entirely fair.

The defendants moved to dismiss the complaint. In the Pleading Decision, the court held that the Sale Counts stated claims on which relief. The Pleading Decision did not reach the defendants' argument that the Covenant foreclosed the Sale Counts.

## II.     LEGAL ANALYSIS

The defendants contend that the Covenant bars the Funds from asserting the Sale Counts. The defendants invoked the Covenant through a motion to dismiss under Rule 12(b)(6). When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pled factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the

14

plaintiffs. Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[5]

The existence of a contractual bar to suit, such as a release or a covenant not to sue, is an affirmative defense that must be asserted in a responsive pleading.[6] A court can consider a contractual bar to suit under Rule 12(b)(6) if the complaint incorporates the document by reference or if the document is subject to judicial notice.[7] In this case, the court can consider the Covenant because it is part of the Voting Agreement, which the complaint incorporates by reference.

## A. The Nature Of A Covenant Not To Sue

A covenant not to sue is a contract in which a potential claimant commits not to assert specified claims against a potential defendant. A covenant not to sue and a release are different things. "A covenant not to sue or execute is distinguished from a release as a

---

[5] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[6] *See* Ct. Ch. R. 8(c); *Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 396 (Del. Ch. 2011). *See generally* 66 Am. Jur. 2d *Release* § 4, Westlaw (database updated Feb. 2023) (describing the invocation of a covenant not to sue as "an affirmative defense to an action").

[7] *See, e.g.*, *Seven Invs.*, 32 A.3d at 396 (considering implications of general release at the pleading stage where it appeared in a document incorporated by reference in the complaint); *Meer v. Aharoni*, 2010 WL 2573767, at *3 (Del. Ch. June 28, 2010) ("In evaluating defendant's motion to dismiss, the Court may also consider the unambiguous terms of the Original and Amended Stipulations, the Proposed Settlement, and the Release, which are integral to the complaint and the resolution of this motion."); *Canadian Com. Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *2 n.9 (Del. Ch. Feb. 22, 2006) ("The Court may consider the Release in deciding a motion to dismiss because the Complaint makes reference to it.").

forbearance of a right rather than a discharge of liability."[8] Historically, that distinction

carried significance, because in most jurisdictions, a release of one joint tortfeasor

extinguished the cause of action as to all joint tortfeasors.[9] That rule created problems for

partial settlements, because a settlement and release with one joint tortfeasor extinguished

the settling party's claim against all other joint tortfeasors. A covenant not to sue avoided

that problem, because the covenant did not extinguish the claim.[10]

---

[8] 76 C.J.S. *Release* § 51, Westlaw (database updated Apr. 2023); *accord* 66 Am. Jur. 2d *Release* § 4; *see* Andrew M. Hinkes, *The Limits of Code Deference*, 46 J. Corp. L. 869, 891 (2021) ("A covenant not to sue is an agreement to not file a lawsuit, rather than an abandonment of any right."). The California Supreme Court rejects the distinction as artificial on the grounds that the result for the claimant is the same regardless of whether the claimant gives a release of the claim or covenants not to assert it. Bradford P. Anderson, *Please Release Me, Let Me Go! Releases of Unknown Claims in the Penumbra of California Civil Code Section 1542*, 9 U.C. Davis Bus. L.J. 1, 7 (2008). When parties settle all claims relating to a past transaction or event, a release and a covenant likely are equivalent. But part of the value of a covenant lies in its ability to address claims relating to future conduct. A release can extinguish claims based on past conduct that a party might learn of or assert in the future, but it cannot cover claims based on future conduct. *Compare Christiana Care Health Servs. v. Davis*, 127 A.3d 391, 395 (Del. 2015) (upholding release of future claims arising from past conduct), *and Spadaro v. Abex Corp.*, 1993 WL 603378, at *2 (Del. Super. Ct. Sept. 9, 1993) (same) *with UniSuper Ltd. v. News Corp.*, 2006 WL 4804015, at *3 (Del. Ch. May 31, 2006) (rejecting release that attempted to release claims arising out of future conduct).

[9] *See* 66 Am. Jur. 2d *Release* § 4.

[10] *Id.*; 76 C.J.S. *Release* § 75. Jurisdictions also addressed the problem of claim extinction by altering the common law rule. *E.g.*, 10 *Del. C.* § 6304; *Clark v. Brooks*, 377 A.2d 365, 372 (Del. Super. Ct. 1977), *aff'd sub nom. Blackshear v. Clark*, 391 A.2d 747 (Del. 1978).

16

When determining the scope of a covenant not to sue, a court construes its terms like any other contract.[11] When multiple claims or multiple defendants are involved, the covenant not to sue only applies to the claims and defendants that fall within its scope.[12] A covenant not to sue can apply "to future as well as to present claims."[13] Unlike a release, where the cancellation of the claim and the discharge of the released party are complete upon execution, the covenant not to sue is an executory contract that contemplates ongoing performance.[14]

Covenants not to sue are generally valid, "as public policy is in no way concerned with the option which a person has to sue or to forbear suit."[15] Some jurisdictions impose public policy limitations on covenants not to sue.[16] Illinois common law prevents covenants not to sue from "exculpating persons from the consequences of their willful and wanton acts."[17] New York common law prohibits contracts that prospectively limit a party from

---

[11] 76 C.J.S. *Release* § 51.

[12] 66 Am. Jur. 2d *Release* § 4.

[13] *Id.*

[14] 76 C.J.S. *Release* § 3.

[15] 17A C.J.S. *Contracts* § 338, Westlaw (database updated Apr. 2023).

[16] 76 C.J.S. *Release* § 53.

[17] *Id.* (citing *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F. Supp. 2d 1009, 1035 (N.D. Ill. 2013)).

liability for willful or grossly negligent acts.[18] Delaware applies the same public policy limitations to covenants not to sue that it applies to contracts generally. Extant decisions hold that a provision in a commercial contract cannot eliminate tort liability for intentional or reckless conduct.[19]

## B.     The Scope Of The Covenant

The Covenant in this case is part of the Drag-Along Right. It is not part of a settlement of all claims arising out of or relating to a particular transaction or event. If it were, there would be no question about its validity, because parties can release claims for breach of fiduciary duty as part of a settlement.[20]

---

[18] *See, e.g.*, *Kalisch-Jarcho, Inc. v. New York*, 448 N.E.2d 413, 416 (N.Y. 1983) ("But an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly negligent acts." (internal citation omitted)); *Schwartz v. Martin*, 919 N.Y.S.2d 217, 219 (N.Y. App. Div. 2011) ("[A]n enforceable release will not insulate a party from grossly negligent conduct . . . ."); *Goldstein v. Carnell Assocs., Inc.*, 906 N.Y.S.2d 905, 905 (N.Y. App. Div. 2010) (collecting cases; stating that "the public policy of this State dictates that 'a party may not insulate itself from damages caused by grossly negligent conduct.'" (quoting *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370 (N.Y. 1992)).

[19] *See* Part III.G, *infra.*

[20] *See Nottingham P'rs v. Dana*, 564 A.2d 1089, 1105–06 (Del. 1989) (permitting release to extinguish all claims relating to the challenged transaction, including claims for breach of fiduciary duty); *Seven Invs.*, 32 A.3d at 398 ("Because Seven Investments released all claims relating to the Purported Accumulated Expenses, Seven Investments cannot bring its claim in Count III to recover the amounts paid under a theory of unjust enrichment. Seven Investments' effort to repackage all of its claims under a breach of fiduciary duty theory is likewise barred. Discala became a fiduciary of Canvas Companies in accordance with the Contribution Agreement and under the LLC Agreement. The General Release extinguished all claims arising out of or relating to these agreements.");

The Covenant creates issues because it is forward-looking. It applies when the Drag-Along Right is properly exercised. For that to happen, the transaction must qualify as a "Sale of the Company," defined as either (i) a stockholder-level sale in which the stockholders sell shares representing more than 50% of the Company's outstanding voting power, (ii) a merger in which the Company's pre-merger stockholders end up holding less than 50% of the Company's outstanding voting power, or (iii) a sale of all or substantially all of the Company's assets.[21]

For the Drag-Along Right to apply, the Sale of the Company must receive approval from both (i) the holders of a majority of the issued and outstanding shares of Preferred Stock, and (ii) the Board, including the director appointed by the Lead Investor and at least one other director approved by the holders of the Preferred Stock.[22] If the Drag-Along Right applies, then the Signatories must fulfill a series of contractual commitments. But no Signatory has to comply with those obligations unless the Sale of the Company satisfies eight requirements. This decision defines a Sale of the Company that meets the eight requirements as a Drag-Along Sale. In abbreviated form, the requirements include:

---

*see also Griffith v. Stein.*, 283 A.3d 1124, 1134 (Del. 2022) ("To satisfy due process concerns, a settlement can release claims that were not specifically asserted in an action but can only release claims that are based on the same identical factual predicate or the same set of operative facts as the underlying action." (cleaned up)).

[21] VA § 3.1.

[22] *Id.* § 3.2.

19

- Each holder of shares of stock of each class or series must receive the same form and amount of consideration as the other shares in their class or series,[23]

- The transaction consideration must be distributed in order of priority as set forth in the charter,[24]

- If there is a choice of consideration, then each holder receives the same choices,[25]

- Signatories cannot be required to make representations and warranties except as to the ownership of, authority over, and ability to covey title to their shares,[26]

- Signatories cannot be required to agree to restrictive covenants,[27]

- Signatories cannot be required to terminate or alter any contractual agreements with the Company,[28]

- Signatories cannot have any liability for a breach of any representation, warrant, or covenant, except to the extent paid from an escrowed portion of the transaction consideration designated for that purpose,[29] and

- Signatories cannot be required to fund the escrow beyond their pro rata share of the negotiated amount.[30]

---

[23] *Id.* § 3.3(f).

[24] *Id.*

[25] *Id.* § 3.3(g).

[26] *Id.* § 3.3(a).

[27] *Id.* § 3.3(b).

[28] *Id.* § 3.3(c).

[29] *Id.* § 3.3(d).

[30] *Id.* § 3.3(e).

Because of these conditions, the Drag-Along Right does not apply to a transaction in which

the Rich Entities extract additional or unique consideration for themselves.

If the Drag-Along Right applies, then each Signatory must take a series of actions.

They include:

- Voting for the Drag-Along Sale if it requires stockholder approval,[31]

- Executing and delivering documentation in support of the Sale of the Company that the Company reasonably requests,[32]

- Agreeing to appoint a stockholder representative with authority to take action under the transaction documents after closing,[33] and

- Agreeing to the Covenant.[34]

  Under the Covenant, each Signatory commits

  to refrain from (i) exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company, or (ii) asserting any claim or commencing any suit (x) challenging the Sale of the Company or this Agreement, or (y) alleging a breach of any fiduciary duty of the Electing Holders or any affiliate or associate thereof (including, without limitation, aiding and abetting breach of fiduciary duty) in connection with the evaluation, negotiation or entry into the Sale of the Company, or the consummation of the transactions contemplated thereby.[35]

---

[31] *Id*. § 3.2(a).

[32] *Id.* § 3.2(c).

[33] *Id.* § 3.2(g).

[34] *Id.* § 3.2(e).

[35] *Id.*

21

Each Signatory thus covenants both to waive appraisal rights *and* not to assert any challenge to the Sale of the Company or any claim for breach of fiduciary duty or aiding and abetting against "the Electing Holders or any affiliate or associate thereof."

The parties agree that the Drag-Along Sale met the contractual requirements and triggered the Signatories' obligations. The parties agree that the Covenant encompasses all of the defendants. They agree that it covers the Sale Counts.[36]

The Funds have not argued that the Covenant was induced by fraud or overreaching. They have not claimed that they failed to understand the Covenant or its implications.

---

[36] The Funds might have pointed to a mismatch between the Covenant and the Funds' challenges to the Drag-Along Sale. As discussed below, commentary to the NVCA model provision describes its purpose as preventing signatories from using claims for breach of fiduciary duty to obtain a quasi-appraisal remedy. It thus most clearly covers a claim that the Board and the holders of the Preferred Stock breached their fiduciary duties by failing to disclose material information to the Company's stockholders or by approving a deal that was not the best transaction reasonably available. The Funds have not asserted that the defendants breached their duty of disclosure in connection with the Drag-Along Sale (they only assert disclosure claims based on the Interested Transactions). They also do not claim that the buyer or another bidder might have offered a better deal. They object to the Interested Transactions through which the directors allegedly enriched themselves and their affiliates at the expense of the Company and its unaffiliated stockholders during the lead up to the Drag-Along Sale. The Covenant sweeps in those claims only because Delaware law compensates for a bright-line rule that causes a cash-out merger to extinguish the sell-side stockholders' standing to sue derivatively by recharacterizing the derivative claims as direct challenges to the merger. *See* Pleading Decision, 2023 WL 2417271, at *28–45.

The Funds might have argued that the Covenant does not apply to self-dealing in the lead-up to a Drag-Along Sale. When the court raised the arguable mismatch at oral argument, the Funds picked up on it. Dkt. 34 at 26, 38. Because this decision declines to hold that the Covenant forecloses the Sale Counts, the Funds can explore this issue in discovery, and the parties can address it later should it prove salient.

Particularly for NEA, that would be a difficult argument to make, because NEA is a member of the NVCA, and the Covenant tracks a provision in the model voting agreement sponsored by that organization.[37] Under that provision, a signatory agrees

> to refrain from (i) exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company, or [(ii); asserting any claim or commencing any suit [(x)] challenging the Sale of the Company or this Agreement, or [(y) alleging a breach of any fiduciary duty of the Selling Investors or any affiliate or associate thereof (including, without limitation, aiding and abetting breach of fiduciary duty) in connection with the evaluation, negotiation or entry into the Sale of the Company, or] the consummation of the transactions contemplated thereby].[38]

The Covenant adopts the most expansive formulation of the model provision by including the bracketed language.

> A comment in the model provision explains the intent of the bracketed language:

> [C]ommon and subordinate preferred stockholders are increasingly filing breach of fiduciary duty claims seeking quasi-appraisal — *i.e.*, damages that mirror the recovery available in an appraisal suit — in transactions subject to drag-along provisions where the junior preferred or common shareholders are to receive no consideration for their shares. Because the directors are often representatives of the senior preferred holders, these suits are difficult to dismiss at an early stage. Accordingly, consideration should be given to expanding the agreement . . . to cover breach of fiduciary suits in transactions subject to the drag along.[39]

---

[37] *See* NVCA, *Model Voting Agreement* § 3.2(e) (updated Mar. 2022), available at https://nvca.org/model-legal-documents.

[38] *Id.* (footnotes omitted).

[39] *Id.* n.18.

The commentary confirms that the Covenant is intended to do what it says and bar breach of fiduciary duty claims based on the Drag-Along Sale.

The defendants' motion squarely presents the question of the Covenant's validity. This is not a case where ambiguity exists about whether a waiver extends to breach of fiduciary duty claims.

## C.    The Case For Facial Invalidity

The Funds' case for holding the Covenant facially invalid is short and sweet: "Under well-settled law, parties cannot waive fiduciary duties of loyalty in Delaware corporations."[40] In support of that proposition, the Funds cite Section 102(b)(7) of the DGCL, which limits the extent to which a charter provision can limit or eliminate a director or officer's liability for money damages for breach of fiduciary duty. They also cite three decisions (including one of my own) which, in dictum, contrast the broad flexibility of parties to waive or limit fiduciary duties in an alternative entity agreement with the more limited ability to waive or limit fiduciary duties in a corporate charter.[41] Those are

---

[40] Dkt. 16 at 56.

[41] *See Miller v. HCP & Co.*, 2018 WL 656378, at *2 (Del. Ch. Feb. 1, 2018) (interpreting forced-sale provision in an LLC agreement that waived all fiduciary duties and that majority member used to effectuate a sale to a third party; noting that "if the parties had chosen to employ the corporate form here, with its common-law fiduciary duties, this matter would be subject to entire fairness review" but that "the members forwent the suite of common-law protections available with the corporate form, and instead chose to create an LLC" in which they explicitly waived fiduciary duties, "despite the presence of a controller with an incentive to take a quick sale, and a Board with sole discretion to approve such a sale, with the single safeguard that the sale must not be to an insider"), *aff'd sub nom. Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018); *Dieckman v. Regency*

24

relatively few authorities for an absolutist proposition. The Funds seem to treat it as self-evident that a provision like the Covenant is facially invalid.

The Funds would have done better to rely on *Totta v. CCSB Financial Corp.*,[42] where Chancellor McCormick addressed the ability of corporate planners to displace equity's power to impose fiduciary duties, evaluate compliance through standards of review, and impose equitable remedies. *Totta* involved a provision in the certificate of incorporation of a bank holding company that prohibited any stockholder from exercising more than 10% of the company's voting power in an election. To minimize disputes over the application of the provision, the charter provided that "[a]ny constructions, applications, or determinations made by the Board of Directors pursuant to this section in

---

*GP LP*, 2016 WL 1223348, at *8 (Del. Ch. Mar. 29, 2016) ("In the limited partnership context, absent contractual modification, a general partner owes fiduciary duties that include a duty of full disclosure. But in stark contrast to the corporate context, in which fiduciary duties cannot be waived, a limited partnership may eliminate all fiduciary duties, including the duty of disclosure." (cleaned up)), *rev'd on other grounds,* 155 A.3d 358 (Del. 2017); *In re Ezcorp Inc. Consulting Agr. Deriv. Litig.,* 2016 WL 301245, at *23 (Del. Ch. Jan. 25, 2016) ("If a controller does not want to assume fiduciary obligations, then it can choose not to issue stock to the public, or not to acquire a dominant stake in a publicly funded firm. If a controller wants to use other people's money, it can do so using debt, which establishes a contractual relationship that does not carry fiduciary obligations. Or a controller can use an alternative entity vehicle and eliminate or restrict fiduciary duties."). Each of these decisions commented in passing on the differences between the degree to which the constitutive documents of a corporation could tailor fiduciary duties and the degree to which the constitutive documents of an alternative entity could do so. None called the question of the extent to which an investor could commit contractually in an investor-level agreement to refrain from asserting investor-level claims that the investor otherwise could freely elect not to assert.

[42] 2022 WL 1751741 (Del. Ch. May 31, 2022), *cert. denied*, 2022 WL 4087800 (Del. Ch. Sept. 7, 2022), *and appeal dismissed*, 284 A.3d 713 (Del. 2022).

good faith and on the basis of such information and assistance as was then reasonably available for such purpose shall be conclusive and binding upon the Corporation and its stockholders" (the "Conclusive-And-Binding Provision").[43] Facing a proxy contest, the incumbent directors interpreted the voting power limitation to apply not only to ownership by a single stockholder, but also to stockholders acting in concert. The new interpretation resulted in the defeat of the insurgent slate.

The Chancellor explained that because the incumbent directors interfered with a proxy contest, they bore the burden of justifying their actions under the form of enhanced scrutiny that applies to elections.[44] The incumbent directors argued that enhanced scrutiny did not apply because of the Conclusive-And-Binding Provision, which contemplated a standard of review comparable to the business judgment rule. Chancellor McCormick held that the Conclusive-And-Binding Provision could not alter the directors' fiduciary obligations or the attendant standard of review:

> Fiduciary duties arise in equity and are a fundamental aspect of Delaware law. The constitutive agreements that govern an entity can only eliminate or modify fiduciary duties and the attendant judicial standards of review to the extent expressly permitted by an affirmative act of the Delaware General Assembly. The General Assembly has granted broad authorization to modify or eliminate fiduciary duties and attendant standards of review in some types

---

[43] *Id.* at *2.

[44] *See MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1129–31 (Del. 2003); *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988) (Allen, C.); *see generally Pell v. Kill*, 135 A.3d 764, 784–93 (Del. Ch. 2016) (collecting authorities addressing the operation of *Blasius* as a form of enhanced scrutiny).

of entities. The General Assembly has granted only limited authority to corporations.[45]

The Chancellor cited Sections 102(b)(7) and 122(17) of the DGCL as the sole provisions through which the General Assembly has authorized limitations on equitable review and fiduciary accountability.[46] She noted that the General Assembly had never expressly authorized a charter provision that could modify the standard of review. As a result, the Chancellor concluded that the Conclusive-And-Binding Provision was invalid.

Chancellor McCormick grounded the persistent power of equity on the constitutional grant of equity jurisdiction to this court: "The Constitution of 1897 retains the distinction between law and equity, and the General Assembly has empowered [the Court of Chancery] to hear and determine all matters and causes in equity."[47] After citing

---

[45] *Totta*, 2022 WL 1751741, at *14.

[46] *Id.* at *16–17 (discussing 8 *Del. C.* § 102(b)(7) and 8 *Del. C.* § 122(17)). The Chancellor also discussed one potential statutory limitation that the parties had not explored and one ineffective statutory limitation. *Id.* at *18, *21 n.215. The unexplored limitation appears in Section 141(a) of the DGCL, and this decision addresses that statutory path below. The ineffective statutory limitation appears in Section 152, which states that "[i]n the absence of actual fraud in the transaction," the board's determination regarding the value of the consideration that a corporation receives for its shares "shall be conclusive." 8 *Del. C.* § 152(d). Despite the seemingly clear "actual fraud" standard in the statutory text, Delaware courts have subjected the board's determination to fiduciary review by applying either the business judgment rule or the entire fairness test depending on whether or not the decision was made by a board majority comprising disinterested and independent directors. *See Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1235 (Del. Ch. 2001) (Strine, V.C.), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002).

[47] *Totta*, 2022 WL 1751741, at *15.

27

the Delaware Supreme Court's decision in *DuPont v. DuPont*,[48] she made the following

observation:

> In the hierarchy of law-making in a democratic regime, courts defer to legislatures. Within constitutional limits, the General Assembly can replace equity with statutory law. For purposes of entity law, that means the General Assembly has the authority to eliminate or modify fiduciary duties and the standards that are applied by this court, or to authorize their elimination or modification through private ordering.[49]

Thus, if the General Assembly has authorized provisions in the constitutive documents of

an entity that eliminate or modify the fiduciary duty regime, then a court will enforce them.

Otherwise, practitioners cannot use the constitutive documents of an entity for that

purpose.[50]

---

[48] 85 A.2d 724 (Del. 1951).

[49] *Totta*, 2022 WL 1751741, at *15 (footnote omitted).

[50] I agree with the Chancellor's assessment of where the allocation of authority among the separate branches of government rests today. The *DuPont* case, however, contemplates a more muscular role for this court's equity jurisdiction. The Delaware Supreme Court analyzed Article IV, Section 10 of the Delaware Constitution of 1897, which provides that this court "shall have all the jurisdiction and powers vested by the laws of this State in the Court of Chancery." Del. Const. art. IV, § 10. After tracing the history of the provision, the high court held that the constitutional grant of jurisdiction empowers the Court of Chancery with, at a minimum, "all the general equity jurisdiction of the High Court of Chancery of Great Britain as it existed prior to the separation of the colonies," except "where a sufficient remedy exists at law." *DuPont*, 85 A.2d at 727, 729. Based on that constitutional grant, the high court held that the General Assembly cannot enact legislation that reduces this court's jurisdiction below the constitutional minimum, unless the General Assembly ensures that there is an adequate remedy at law. *Id*. at 729. The

28

In *Delman v. GigAcquisitions3, LLC*,[51] Vice Chancellor Will relied on *Totta* to hold that stockholders were not estopped from asserting a claim for breach of the duty of loyalty simply because the potential conflicts of interest faced by the corporate fiduciaries "were disclosed in the prospectus when the plaintiff invested . . . and again in the Proxy" issued in connection with the transaction they challenged.[52] She posited that "[s]uch an approach

---

Delaware Supreme Court explained that through this grant of authority, the framers of the Constitution of 1897

> intended to establish for the benefit of the people of the state a tribunal to administer the remedies and principles of equity. They secured them for the relief of the people. This conclusion is in complete harmony with the underlying theory of written constitutions. Its result is to establish by the Judiciary Article of the Constitution the irreducible minimum of the judiciary. It secures for the protection of the people an adequate judicial system and removes it from the vagaries of legislative whim.

*Id.* One scholar has argued that *DuPont* creates "substantial doubt" about whether fiduciary duties can be waived or eliminated at all, even with statutory authorization from the General Assembly. Lyman Johnson, *Delaware's Non-Waivable Duties*, 91 B.U. L. Rev. 701, 702 (2011). I would not go that far, because the weight of authority demonstrates that fiduciary duties can be tailored. There is arguably an open question as to whether the General Assembly can constitutionally authorize provisions that purport to eliminate all fiduciary duties or capaciously limit them without ensuring the existence of an adequate remedy at law. Experience has shown that contractual remedies and the implied covenant of good faith and fair dealing are not fiduciary substitutes. *See generally* Leo E. Strine, Jr. & J. Travis Laster, *The Siren Song of Unlimited Contractual Freedom,* in *Research Handbook on Partnerships, LLCs and Alternative Forms of Business Organizations* (Robert W. Hillman & Mark J. Loewenstein eds., 2014). Although it hardly seems likely that the Delaware courts would rely on *DuPont* to pare back the blanket authorization for waiving or limiting fiduciary duties that appear in the alternative entities statutes, the *DuPont* decision provides insight into equity's true potential.

[51] 288 A.3d 692 (Del. Ch. 2023).

[52] *Id.* at 714.

would be inconsistent with the fundamental principles of our law" and stated that that "Delaware corporate law 'does not allow for a waiver of the directors' duty of loyalty.'"[53] Relying on *Totta*, she observed that "[t]he Delaware General Assembly alone 'has the authority to eliminate or modify fiduciary duties and the standards that are applied by this court, or to authorize their elimination or modification.'"[54] She concluded that "[u]nless and until that occurs," an entity that chooses the "corporate form promises investors that equity will provide the important default protections it always has."[55]

The Funds argue that the Covenant disguises the wolf of an impermissible limitation on fiduciary duties in the sheep's clothing of a stockholder-level agreement. That, they say, is no distinction at all. Under their bright-line approach, the Covenant is facially invalid.

The Funds have advanced one reasonable interpretation of the law, but it is a stark account that elevates fiduciary accountability above all else, fails to explore the permissible bounds of fiduciary tailoring, and ignores the difference between limitations in the constitutive documents of an entity and limitations in a stockholder-level agreement. The Funds' absolutist framing pays no heed to the importance of private ordering, which is another fundament of Delaware entity law.

---

[53] *Id.* at 715 (quoting *Schock v. Nash*, 732 A.2d 217, 225 n.21 (Del. 1999)).

[54] *Id.* (quoting *Totta*, 2022 WL 1751741, at *15).

[55] *Id.* (internal quotations omitted).

I have no quarrel with *Totta* because that case dealt with a charter provision. The creation of a body corporate through the issuance of a charter constitutes an exercise of state authority, equivalent in its efficacy to the enactment of a statute (notwithstanding the now longstanding practice of the state approving charters under a general incorporation law). Through the issuance of a charter, the state creates an otherwise impossible being—an artificial person—capable of exercising the powers conferred by the state and with the limitations that the state wishes to impose. To use the charter to modify the duties attendant to that state-created relationship, parties should need express authority from the state. I also have no quarrel with *GigAcquisitions3*, where the defendants sought to achieve fiduciary tailoring through disclosure plus a notion akin to assumption of risk. The reasoning of those cases does not apply to the current dispute, where the Funds voluntarily restricted their ability to exercise stockholder-level rights in a negotiated agreement. The Funds' position may well be correct, but their authorities do not go that far.

## D.     The Case Against Facial Invalidity

The argument against the Covenant's facial invalidity takes time to unspool. It starts by showing that fiduciary obligations can be tailored. At the heart of a fiduciary relationship lies a nucleus of other-regarding loyalty that cannot be altered or eliminated without rendering the relationship non-fiduciary. But the orientation and scope of the relationship can be modified. Rather than disavowing that framework, Delaware corporate law deploys it, and both the DGCL and the common law permit a greater space for fiduciary tailoring than is commonly recognized. Set within that broader landscape, the Covenant achieves an outcome that tracks what Delaware law already permits. The analysis next

31

incorporates Delaware's support for private ordering, and the Delaware Supreme Court's embrace of the contractarian theory of corporate law in *Salzberg v. Sciabacucchi*[56] and *Manti*. The analysis also takes into account the ability of stockholders to agree to greater restrictions on their stockholder-level rights in a negotiated agreement than what corporate planners can impose through the constitutive documents. With a deeper understanding of what Delaware corporate law permits, the case against the facial invalidity of the Covenant is strong.[57]

---

[56] 227 A.3d 102 (Del. 2020).

[57] As an aside, this case is not about whether fiduciaries must comply with a contract that purports to limit their ability to fulfill their duties. Some have read *Paramount Communications Inc. v. QVC Network Inc.,* 637 A.2d 34 (Del. 1994), as suggesting that a contract cannot limit fiduciary duties, thereby giving fiduciaries a get-out-of-contract-free card, but learned commentators reject that interpretation. *See, e.g.*, R. Franklin Balotti & A. Gilchrist Sparks, III, *Deal-Protection Measures and the Merger Recommendation*, 96 Nw. U. L. Rev. 467, 468–69 (2002) ("In *Smith v. Van Gorkom*, the Delaware Supreme Court established that Delaware law does not give directors, just because they are fiduciaries, the right to accept better offers, distribute information to potential new bidders, or change their recommendation with respect to a merger agreement even if circumstances have changed." (footnote omitted)); John F. Johnston, *Recent Amendments to the Merger Sections of the DGCL Will Eliminate Some—But Not All—Fiduciary Out Negotiation and Drafting Issues,* 1 Mergers & Acquisitions L. Rep. 20, 777, 778 (July 20, 1998) (BNA) ("[T]here is . . . no public policy that permits fiduciaries to terminate an otherwise binding agreement because a better deal has come along, or circumstances have changed."); John F. Johnston & Frederick H. Alexander, *Fiduciary Outs and Exclusive Merger Agreements—Delaware Law and Practice*, 11 Insights: The Corp. & Sec. L. Advisor No. 2, 15, 15 (Feb. 1997) ("[T]he Delaware Supreme Court held that directors of Delaware corporations may not rely on their status as fiduciaries as a basis for (1) terminating a merger agreement due to changed circumstances, including a better offer; or (2) negotiating with other bidders in order to develop a competing offer."); A. Gilchrist Sparks, III, *Merger Agreements Under Delaware Law—When Can Directors Change Their Minds?*, 51 U. Miami L. Rev. 815, 817 (1997) ("[*Van Gorkom*] makes it clear that under Delaware law there is no implied fiduciary out or trump card permitting a board to terminate a merger

### 1. Contractual Tailoring Of Fiduciary Duties

"Contractual and fiduciary relationships are the two dominant legal forms of interaction through which persons can pursue individual and shared interests."[58] The two domains, while separate, are deeply intertwined, because many fiduciary relationships are formed through contract.[59]

The extent to which fiduciary roles can be tailored implicates two competing policies:

> First, in a legal order founded on liberal values, individuals should in general be free to set the normative terms on which they interact. This points in favour [sic] of permitting opt outs, so long as relevant legal and other requirements are satisfied. On the other hand, the mediating function of social roles depends on stability in the normative constitution of these roles; where this is lost, roles may lose their traction as normative resources and people may stop organizing their affairs with reference to them. Where fiduciary law too readily permits opt outs, there is a risk that fiduciary roles might cease to be comprehensible to those whose actions engage with them, and this might generate costs. . . . There are reasons to think that social roles can contribute to human autonomy by providing socially recognized options

---

agreement before it is sent to a stockholder vote."). To the extent some have viewed *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 933 (Del. 2003), as supporting a similar fiduciary trump card, I have argued otherwise. *See* J. Travis Laster, *Omnicare's Silver Lining*, 38 J. Corp. L. 795, 818–27 (2013). This case is not about fiduciaries limiting their freedom of action by contract; it is about non-fiduciary stockholders agreeing to a transaction-specific limitation on their ability to assert stockholder-level claims against fiduciaries.

[58] Paul B. Miller & Andrew S. Gold, *Introduction* to Contract, Status, and Fiduciary Law 1 (Paul B. Miller & Andrew S. Gold, eds., 2016) [hereinafter Contract and Fiduciary Law].

[59] *Id.* at 2, 5.

that may be the subject of autonomous choice; thus, there are reasons to be sceptical [sic] about opt outs from a liberal point of view.[60]

Those twin concerns manifest themselves in Delaware law through the dual principles of private ordering and fiduciary accountability. For different types of fiduciaries, the law may balance the policies differently.[61]

"[T]he word 'fiduciary' is anglicized Latin, meaning trustee-like."[62] Fiduciary duties are thus obligations that are similar to those of a trustee, and a fiduciary relationship is one that is analogous to that between an express trustee and beneficiary.[63] Delaware trust law currently authorizes a trust agreement to modify nearly every aspect of a trustee's duties.[64] By statute, a trust instrument governed by Delaware law may restrict, eliminate, or otherwise vary "[a] fiduciary's powers, duties, standard of care, rights of indemnification and liability to persons whose interests arise from that instrument," subject only to a floor that prevents "exculpation or indemnification of a fiduciary for the fiduciary's own wilful [sic] misconduct" or "a court of competent jurisdiction from removing a fiduciary on

---

[60] Matthew Harding, *Fiduciary Undertakings*, *in* Contract and Fiduciary Law 88 (footnote omitted).

[61] *Id.*

[62] Gregory Klass, *What if Fiduciary Obligations are like Contractual Ones?*, *in* Contract and Fiduciary Law 93.

[63] *Id.* at 93–94.

[64] *E.g.*, 12 *Del. C.* § 3303(a) ("The rule that statutes in derogation of the common law are to be strictly construed shall have no application to this section. It is the policy of this section to give maximum effect to the principle of freedom of disposition and to the enforceability of governing instruments.").

account of the fiduciary's wilful [sic] misconduct."[65] For purposes of that statutory floor "[t]he term 'wilful [sic] misconduct' shall mean intentional wrongdoing, not mere negligence, gross negligence or recklessness and 'wrongdoing' means malicious conduct or conduct designed to defraud or seek an unconscionable advantage."[66] Somewhat strangely, Delaware corporate law now stands as the bastion of traditional duties, even

---

[65] *Id.* ("Notwithstanding any other provision of this Code or other law, the terms of a governing instrument may expand, restrict, eliminate, or otherwise vary any laws of general application to fiduciaries, trusts, and trust administration, including, but not limited to, any such laws pertaining to: . . . (5) A fiduciary's powers, duties, standard of care, rights of indemnification and liability to persons whose interests arise from that instrument . . . provided, however, that nothing contained in this section shall be construed to permit the exculpation or indemnification of a fiduciary for the fiduciary's own wilful [sic] misconduct or preclude a court of competent jurisdiction from removing a fiduciary on account of the fiduciary's wilful [sic] misconduct."); *see* 12 *Del. C.* § 3586 ("A trustee who acted in good faith reliance on the terms of a written governing instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance."); 12 *Del. C.* § 3588(a) (addressing ability of beneficiary to consent conduct by trustee constituting a breach of fiduciary duty).

[66] *E.g.*, 12 *Del. C.* § 3301(g).

though director duties were less onerous than those of trustees[67] and partners.[68] To the extent that trustee duties establish the model for director duties, Delaware's current trustee paradigm suggests that director duties should be almost fully contractable. In such a world, the Covenant could not be facially invalid.

Let's assume, however, that the contractarianism only conquered trust law by statute, such that that director duties remain modeled on those that a trustee owed at common law. Even then, a trust instrument could provide for fiduciary tailoring. A trust instrument could not eliminate the trustee's core fiduciary obligation to exercise its powers

---

[67] Rather than declaring that directors had the same duties as trustees, Delaware decisions described their duties as in the nature of trustees. *See Bovay v. H. M. Byllesby & Co.*, 38 A.2d 808, 813 (Del. 1944) (describing stock to be "in the nature" of a trust fund); *Bodell v. Gen. Gas & Elec. Corp.*, 132 A. 442, 446 (Del. Ch. 1926), *aff'd*, 140 A. 264 (Del. 1927) ("There is no rule better settled in the law of corporations than that directors in their conduct of the corporation stand in the situation of fiduciaries. While they are not trustees in the strict sense of the term, yet for convenience they have often been described as such."). Scholars have noted that the application of fiduciary duties to directors was "less rigorous, since the business situation demands greater flexibility than the trust situation." Adolf A. Berle, Jr., *Corporate Powers As Powers in Trust*, 44 Harv. L. Rev. 1049, 1074 (1931); *accord* Deborah A. DeMott, *Beyond Metaphor: An Analysis of Fiduciary Obligation*, 1988 Duke L.J. 879, 908–09 (1988) ("As the law has developed, trustees are under more stringent restrictions in their dealings with trust property than are corporate directors in their personal transactions with the corporation."); *see* Restatement (Third) of Trusts § 78 (Am. L. Inst. 2007), Westlaw (database updated Mar. 2023) ("The duty of loyalty is, for trustees, particularly strict even by comparison to the standards of other fiduciary relationships.").

[68] When describing the duties owed by partners, Justice Cardozo famously invoked the "punctilio of an honor most sensitive." *Meinhard v. Salmon*, 249 N.Y. 458, 464, (N.Y. 1928). By statute, fiduciary duties in Delaware general and limited partnerships are fully contractable. *See* 6 *Del. C.* §§ 15-103, 17-1101.

in pursuit of what the trustee believed was in the best interests of the beneficiary.[69] A trust instrument could specify the beneficiaries of the trust, thereby identifying for whose benefit the trustee had to selflessly pursue the trust's purpose.[70] A trust instrument could orient the trustee's fiduciary duties through a purpose clause or by cabin the trustee's discretion by giving specific instructions to the trustee.[71] Most importantly for present purposes, the trust instrument could authorize the trustee to engage in transactions that otherwise would be disloyal.[72]

---

[69] Lionel D. Smith, *Contract, Consent, and Fiduciary Relationships*, in Contract and Fiduciary Law 128, 134; *accord* George G. Bogert et al., *Bogert's The Law of Trusts & Trustees* § 541 at 232 (3d ed. 2020) ("Although a settlor can modify a trustee's duties to a degree, the existence of certain duties is critical to the existence of the trust relationship."); Restatement (Third) of Trusts, *supra*, § 86 cmt. b ("A trustee's duties . . . may be modified by the terms of the trust, but the duties of trusteeship are subject to certain minimum standards that are fundamental to the trust relationship and normally essential to it.").

[70] *See* Bogert, *supra*, § 541 at 252–53 ("A settlor may provide guidance to the trustee to prefer one beneficiary or category of beneficiaries over others, and the trustee must follow that guidance."); *see also* Restatement (Third) of Trusts, *supra*, § 49 ("[T]he existence and extent of the trustee's duty of loyalty to the beneficiary . . . may of course be imposed by the terms of the trust; or the terms of the trust may limit the extent of such duties, or in some cases may prevent such duties from being imposed.").

[71] Bogert, *supra*, § 541 at 235–37 ("A fundamental duty of the trustee is to carry out the directions of the testator or settlor as expressed in the terms of the trust. Any attempt to take action contrary to the settlor's direction may be deemed to constitute a unilateral and invalid deviation from the trust terms." (footnotes omitted)); *see* Restatement (Third) of Trusts, *supra*, § 76(1) ("The trustee has a duty to administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law.").

[72] Bogert, *supra*, § 543 at 371, 579–83 (noting that express grants of authority to trustees to perform specific acts that otherwise would be disloyal have often been upheld; collecting cases); *see* Restatement (Third) of Trusts, *supra*, § 78 ("*Except as otherwise provided in the terms of the trust*, a trustee has a duty to administer the trust solely in the

Those accommodations for fiduciary tailoring suggest that if the Covenant appeared in a trust instrument, then it would not be facially invalid. The Covenant is part of the Drag-Along Right, which authorizes a contractually specified transaction. That transaction might otherwise constitute a loyalty breach, but a common law trust instrument could authorize such a transaction explicitly. The Covenant becomes a belt-and-suspenders provision that adds an obligation not to sue where a court applying trust law would find no claim.

Another prototypical fiduciary relationship exists between agent and principal. As with trust law, an agency agreement cannot eliminate the core fiduciary obligation that the agent exercise its authority to fulfill its charge from the principal by acting selflessly to pursue what the agent believes to be the principal's best interest.[73] An agency agreement can orient the agent's duties through a narrow purpose clause or cabin the agent's discretion

---

interest of the beneficiaries, or solely in furtherance of its charitable purpose." (emphasis added)); *id.* cmt. c(2) ("A trustee may be authorized by the terms of the trust, expressly or by implication, to engage in transactions that would otherwise be prohibited by the rules of undivided loyalty stated in Subsections (1) and (2). For example, the terms of a trust may permit the trustee personally to purchase trust property or borrow trust funds, or to sell or lend the trustee's own property or funds to the trust."); *cf.* Berle, *supra*, at 1073 ("In this respect, corporation law is substantially at the stage in which equity was when it faced the situation of a trustee who had been granted apparently absolute powers in his deed of trust. So far as the law and the language went, the power was absolute; the trustee could do as he pleased; could perhaps trade with himself irrespective of his adverse interests; could, perhaps, sell the trust assets at an unfairly low price.").

[73] Restatement (Third) of Agency § 8.06 (Am. L. Inst. 2006), Westlaw (database updated Mar. 2023).

with specific instructions.[74] Most significantly for present purposes, agency law permits a principal to consent in advance to specific conduct that otherwise would constitute loyalty breach. Under the blackletter rule,

> Conduct by an agent that would otherwise constitute a breach of duty . . . does not constitute a breach of duty if the principal consents to the conduct, provided that
>
> (a) in obtaining the principal's consent, the agent
>
> (i) acts in good faith,
>
> (ii) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and
>
> (iii) otherwise deals fairly with the principal; and
>
> (b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship.[75]

The commentary explains that these conditions impose "mandatory limits on the circumstances under which an agent may be empowered to take disloyal action."[76]

---

[74] Restatement (Third) of Agency, *supra*, § 8.08, cmt. b ("A contract may also, in appropriate circumstances, raise or lower the standard of performance to be expected of an agent . . . ."); *see* Deborah A. DeMott, *Corporate Officers As Agents*, 74 Wash. & Lee L. Rev. 847, 869 (2017) ("Agency law acknowledges the possibility of contractual solutions by embracing a role for agreements between principals and agents that define in advance the applicable standard of performance.")

[75] Restatement of Agency (Third), *supra*, § 8.06.

[76] *Id.* cmt. b.

The agency standard draws an important distinction between general attempts at fiduciary waivers and narrowly tailored authorizations.

> [A]n agreement that contains general or broad language purporting to release an agent in advance from the agent's general fiduciary obligation to the principal is not likely to be enforceable. This is because a broadly sweeping release of an agent's fiduciary duty may not reflect an adequately informed judgment on the part of the principal; if effective, the release would expose the principal to the risk that the agent will exploit the agent's position in ways not foreseeable by the principal at the time the principal agreed to the release.[77]

"In contrast, when a principal consents to specific transactions or to specified types of conduct by the agent, the principal has a focused opportunity to assess risks that are more readily identifiable."[78] The "agent bears the burden of establishing that the requirements stated in this section have been fulfilled."[79]

If the Covenant addressed an agency relationship in which the Funds acted as principals and Rich and his affiliates and associates acted as agents, then the Covenant would not be facially invalid. Rich openly sought the Funds' consent to effectuate a Drag-Along Sale in a setting where it was clear what he wanted to accomplish. As sophisticated investors, the Funds knew what was being asked of them. The Drag-Along Sale was specific transaction that reasonably be expected to occur in the ordinary course of the relationship. Although a sale of the Company is not generally an ordinary course

---

[77] *Id.*

[78] *Id.*

[79] *Id.*

transaction for the Company itself, it is the ever-present goal for venture capital investors.[80] In VC heaven, successful exits are ordinary course events. The Funds had wanted a liquidity event and knew that Rich would want one too. In this setting, the Drag-Along Sale was not a breach of duty, and the Covenant again becomes a belt-and-suspenders provision that adds an obligation not to sue where a court applying agency law would find no claim.

The examples from trust and agency law indicate that if judged by traditional standards for fiduciary tailoring, the Covenant would not be facially invalid. It would be upheld.

## 2. Delaware Corporate Law And Fiduciary Tailoring

The next question is whether Delaware corporate law has restricted the traditional space for fiduciary tailoring. Delaware corporate law is popularly understood to impose mandatory fiduciary duties that cannot be modified. Although monetary liability for the duty of care can be eliminated, the underlying duty cannot be altered, and the duty of loyalty stands inviolate. That view gains currency from contrasting Delaware corporations

---

[80] *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 50–51 (Del. Ch. 2013) (describing types of VC exits); Victor Fleischer, *Two and Twenty: Taxing Partnership Profits in Private Equity Funds*, 83 N.Y.U. L. Rev. 1, 8–9 (2008) ("In the case of venture capital funds, the portfolio companies are start-ups. . . . After some period of time, the fund sells its interest in the portfolio company to a strategic or financial buyer, or it takes the company public and sells its securities in a secondary offering."); D. Gordon Smith, *The Exit Structure of Venture Capital*, 53 UCLA L. Rev. 315, 316 (2005) ("Before venture capitalists invest, they plan for exit."); *id.* at 356 ("Any venture capitalist who desires to remain in business ... must successfully raise funds, invest them in portfolio companies, then exit the companies and return the proceeds to the fund investors, who in turn are expected to reinvest in a new fund formed by the same venture capitalist.").

with alternatives entities, where the governing statutes authorize the full elimination of fiduciary duties. While it is true that Delaware corporate law has not forged as far afield as its alternative-entity brethren, the corporate form has not rejected the traditional methods of fiduciary tailoring. To the contrary, both the DGCL and Delaware common law accommodate the traditional forms, and the common law has gone further through a concept of contractual preemption articulated most prominently in *Nemec v. Shrader*.[81]

### a. Statutorily Authorized Tailoring

Sections 102(b)(7) and 122(17) are the two widely acknowledged paths for fiduciary tailoring in the DGCL. Upon closer review, those are not the only routes that the DGCL makes available.

### i. Section 102(b)(7)

The most well-known provision in the DGCL that permits fiduciary tailoring is Section 102(b)(7). It currently provides:

> The certificate of incorporation may also contain . . . [a] provision eliminating or limiting the personal liability of a director or officer to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director or officer, provided that such provision shall not eliminate or limit the liability of:
>
> (i) A director or officer for any breach of the director's or officer's duty of loyalty to the corporation or its stockholders;
>
> (ii) A director or officer for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law;

---

[81] 991 A.2d 1120, 1129 (Del. 2010) (explaining that where parties have entered into a contract, competing claims for breach of fiduciary duty arising out of the same facts are "foreclosed as superfluous").

(iii) A director under § 174 of this title;

(iv) A director or officer for any transaction from which the director or officer derived an improper personal benefit; or

(v) An officer in any action by or in the right of the corporation.[82]

The five exclusions thus prevent a charter provision from eliminating monetary liability for breaches of the duty of loyalty, including its subsidiary requirement that a fiduciary must act in good faith. For directors, the combination of exclusions only permits a charter provision to eliminate monetary liability for breaches of the duty of care. For officers, the combination of exclusions only permits a charter provision to eliminate monetary liability to the stockholders for direct claims for breaches of the duty of care.

Section 102(b)(7) does not speak directly to the Covenant because the statute addresses the extent to which the constitutive documents of the corporation can limit or eliminate monetary liability for breach of fiduciary duty. Section 102(b)(7) expressly addresses the extent to which a provision *in the corporate charter* can do so. Because a bylaw provision cannot conflict with a contrary provision in the charter or in the DGCL, Section 102(b)(7) implicitly addresses whether a bylaw can do so.[83] The plain language of 102(b)(7) does not address a stockholder-level agreement in which a stockholder commits to refrain from asserting a claim that the stockholder could freely decline to pursue.

---

[82] 8 *Del. C.* § 102(b)(7).

[83] *Sinchareonkul v. Fahnemann*, 2015 WL 292314, at *6 (Del. Ch. Jan. 22, 2015) ("A bylaw that conflicts with the charter is void, as is a bylaw or charter provision that conflicts with the DGCL.").

43

As discussed below, the structure of the DGCL demonstrates that stockholders have greater freedom to enter into private agreements that constrain their stockholder-level rights than what can be accomplished in the charter and bylaws.[84] Because of the distinction between a private stockholder agreement and a provision that appears in the charter or bylaws. Section 102(b)(7) does not render the Covenant facially invalid.

Conversely, Section 102(b)(7) does provide some signals about what stockholders can agree to in a stockholder-level agreement. To the extent a particular measure can appear in the more restricted domain of the charter or bylaws, then stockholders should be able to restrict themselves to at least the same degree in a stockholder-level agreement.

By analogy to Section 102(b)(7), a covenant in a stockholder-level agreement in which the signatories agreed not to assert claims for breach of the duty of care is not contrary to Delaware public policy. The analogy to Section 102(b)(7) also indicates that, relatively speaking, Delaware law is less concerned about limiting liability for direct claims than for derivative claims. Section 102(b)(7)'s approach to officers illustrates the distinction, because Section 102(b)(7) authorizes a provision that limits or eliminates monetary liability for direct care claims while foreclosing similar exculpation for corporate

---

[84] *See* Part II.D.3.b, *infra*. There is one decision which applies the limitations in Section 102(b)(7) to a settlement agreement. *See Hills Stores Co. v. Bozic*, 1997 WL 153823, at *6 (Del. Ch. Mar. 25, 1997) (Strine, V.C.). After citing Section 102(b)(7), the court stated simply, "I see no reason why the public policy behind § 102(b)(7) should not also apply to settlement agreements." *Id.* The court did not delve into the issue any more deeply, nor did the decision consider any other authorities.

care claims. The Covenant only addresses direct claims, making it relatively more acceptable.

The Covenant extends to all direct claims for breach of fiduciary duty that the Signatories could assert against a Drag-Along Sale. That broad framing includes direct claims for the duty of care, and at least that much of the Covenant should be valid.

By analogy to Section 102(b)(7), a covenant in a stockholder-level agreement in which the signatories agreed not to assert direct claims for breaches of duty based on recklessness are not contrary to Delaware public policy. When analyzing the scope of exculpation under Section 102(b)(7), Delaware cases have held consistently that that gross negligence encompasses recklessness.[85] In civil cases not involving business entities, the

---

[85] *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 652 n.45 (Del. Ch. 2008) (Strine, V.C.) ("[T]he definition [of gross negligence in corporate law] is so strict that it imports the concept of recklessness into the gross negligence standard . . . ."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005) ("Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." (cleaned up)); *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." (cleaned up)); *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. Jan. 19, 1988) (Allen, C.) (explaining that to be grossly negligent, a decision "has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion" (cleaned up)); *see McPadden v. Sidhu*, 964 A.2d 1262, 1274 (Del. Ch. 2008) ("[F]rom the sphere of actions that was once classified as grossly negligent conduct that gives rise to a violation of the duty of care, the Court has carved out one specific type of conduct—the intentional dereliction of duty or the conscious disregard for one's responsibilities—and redefined it as bad faith conduct, which results in a breach of the duty of loyalty. Therefore, Delaware's current understanding of gross negligence is conduct that constitutes reckless indifference or actions that are without the bounds of reason.").

Delaware Supreme Court has defined gross negligence as "a higher level of negligence representing 'an extreme departure from the ordinary standard of care.'"[86] Under that framework, gross negligence "signifies more than ordinary inadvertence or inattention," but it is "nevertheless a degree of negligence, while recklessness connotes a different type of conduct akin to the intentional infliction of harm."[87] In Delaware entity law, by contrast, gross negligence encompasses recklessness, such that Section 102(b)(7) permits exculpation for recklessness.[88] The Covenant encompasses all direct claims for breach of

---

[86] *Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990) (quoting W. Prosser, *Handbook of the Law of Torts* 150 (2d ed. 1955)). This test "is the functional equivalent" of the test for "[c]riminal negligence." *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del. 1987). By statute, Delaware law defines "criminal negligence" as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

11 *Del. C.* § 231(a). The same statute provides that a person acts recklessly when "the person is aware of and consciously disregards a substantial and unjustifiable risk that the element exists or will result from the conduct." *Id.* § 231(e). As with criminal negligence, the risk "must be of such a nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.*; *see id.* § 231(a).

[87] *Jardel*, 523 A.2d at 530.

[88] *See In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *50 n.22 (Del. Ch. Mar. 1, 2021) ("The reality that a care claim requires recklessness warrants re-conceptualizing what exculpation accomplishes. Exculpation does not eliminate liability for negligence, because that form of liability does not exist in the first place. In the corporate context, a breach of the duty of care requires recklessness. The real function of exculpation is to eliminate liability for recklessness.").

fiduciary duty that the Signatories could assert against a Drag-Along Sale, which includes direct claims grounded in recklessness. That aspect of the Covenant appears valid.

Because of the Covenant validly forecloses claims for the duty of care, it is not facially invalid. Section 102(b)(7) therefore does not lead ineluctably to illegitimacy. Section 102(b)(7) imposes limitations on what can appear in the charter and bylaws, and it supports inferences about what Delaware law may otherwise permit or foreclose, but it does not answer the question of the Covenant's validity. To the contrary, analogies to what Section 102(b)(7) permits in the more constrained context of a charter indicate that a significant portion of the Covenant's scope complies with Delaware law.

### ii. Section 122(17)

A second provision in the DGCL that contemplates fiduciary tailoring is Section 122(17). Under that section, every Delaware corporation has the power to

> [r]enounce, in its certificate of incorporation or by action of its board of directors, any interest or expectancy of the corporation in, or in being offered an opportunity to participate in, specified business opportunities or specified classes or categories of business opportunities that are presented to the corporation or 1 or more of its officers, directors or stockholders.[89]

A claim for usurpation of a corporate opportunity is a claim for breach of fiduciary duty.[90]

With the adoption of Section 122(17), "Delaware corporations and managers became free

---

[89] 8 *Del. C.* § 122(17).

[90] *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 442 (Del. 1996); *Guth v. Loft, Inc.*, 5 A.2d 503, 511 (Del. 1939).

to contract out of a significant portion of the duty of loyalty."[91] Not only that, but the opt-out arrangement need not appear in the charter, disconfirming the theory that all forms of fiduciary tailoring must be charter-based. Under Section 122(17), the board of directors can renounce a specified type or class of opportunities by resolution.

Conceptually, Section 122(17) achieves this result by authorizing the board to accelerate a decision it could make once a corporate opportunity arises. A fiduciary that wishes to pursue a corporate opportunity can present it to the board, and if the board renounces the opportunity, then the fiduciary can proceed.[92]

By authorizing advance renunciations of corporate opportunities, Section 122(17) enables a board to commit in advance to reject a particular type or class of opportunities. In practice, a corporate opportunity waiver functions like a covenant not to sue. "The board's authority to govern corporate affairs extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider."[93] A

---

[91] Gabriel Rauterberg & Eric Talley, *Contracting Out of the Fiduciary Duty of Loyalty: An Empirical Analysis of Corporate Opportunity Waivers*, 117 Colum. L. Rev. 1075, 1078 (2017); *see* Edward P. Welch & Robert S. Saunders, *Freedom and Its Limits in the Delaware General Corporation Law*, 33 Del. J. Corp. L. 845, 859 (2008) (citing Section 122(17) as a provision in the DGCL that "provide[s] some measure of protection to directors for approving transactions that might otherwise be seen as a breach of the duty of loyalty").

[92] *See Johnston v. Greene*, 121 A.2d 919, 925 (Del. 1956).

[93] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021).

board can decide whether or not to assert a claim for usurpation of a corporate opportunity. Through a corporate opportunity waiver, the board commits not to assert a claim for usurpation of a corporate opportunity that falls within specified parameters.

The advance renunciation of a specific type of class of corporate opportunities has obvious parallels to the ability of a trust agreement or an agency agreement to authorize a specific transaction that otherwise would constitute a breach of duty. The parallel also explains why the advance renunciation must be narrowly tailored to "specified business opportunities or specified classes or categories of business opportunities."[94]

Section 122(17) shows that the DGCL follows trust and agency law by permitting the authorization of specific transactions that otherwise could constitute a fiduciary breach. The Covenant operates at the stockholder level to achieve a comparable result. Section

---

[94] 8 *Del. C.* § 122(17); *accord Alarm.com Hldgs., Inc. v. ABS Cap. P'rs Inc.*, 2018 WL 3006118, at *8–9 & n.46 (Del. Ch. June 15, 2018) (discussing specificity requirement), *aff'd on other grounds*, 204 A.3d 113 (Del. 2019); Rauterberg & Talley, *supra*, at 1096 ("On its face, [Section 122(17)] requires a [corporate opportunity waiver] to be worded with some particularity."). The synopsis to the bill adopting Section 122(17) elaborates on this point by explaining that

> categories of business opportunities may be specified by any manner of defining or delineating business opportunities or the corporation's or any other party's entitlement thereto or interest therein, including, without limitation, by line or type of business, identity of the originator of the business opportunity, identity of the party or parties to or having an interest in the business opportunity, identity of the recipient of the business opportunity, periods of time or geographical location.

Senate Bill 363, 72 Del. Laws 619 (2000).

122(17) is a powerful indication that that the Covenant is not contrary to Delaware public policy and is not facially invalid.

### iii.     Section 102(a)(3)

A third way the DGCL permits the corporate planners to tailor the powers of corporate fiduciaries and the duties they owe is through a limited purpose clause. A corporation's charter must state "[t]he nature of the business or purposes to be conducted or promoted."[95] The DGCL authorizes the charter to say that "the purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware," with the effect that that "all lawful acts and activities shall be within the purposes of the corporation, except for express limitations."[96] Adopting that broad purpose is advisable, because if a corporation has a narrow purpose, then the corporation lacks the power to engage in activities that exceed or fall outside of its purpose, rendering those actions void.[97]

---

[95] 8 *Del.* § 102(a)(3).

[96] *Id.*

[97] *See Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 442 (Del. Ch. 2020) ("[A] corporation retains the ability to introduce uncertainty about its capacity or power by including provisions in its charter that disavow particular powers or forbid the corporation from entering into particular lines of business or engaging in particular acts."); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 2.1 (4th ed. & Supp. 2023-1) (explaining the general inapplicability of the *ultra vires* doctrine based on lack of corporate power or capacity, while identifying remaining applications of the doctrine, including a charter provision that forbids the corporation from into particular lines of business or engaging in particular acts); *see also Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 648–54 (Del. Ch. 2013) (discussing

By denying the corporation the power to engage in acts outside of a narrowly defined purpose and rendering non-compliant acts void, a narrow purpose clause limits the directors' powers and concomitant duties.[98] Absent a narrow purpose clause, corporate directors have an obligation to seek to maximize the long-term value of the corporation for the benefit of its stockholders.[99] Directors are obligated to pursue the course that they believe in good faith will achieve that goal, meaning that if the directors subjectively believe that existing one business and entering another will maximize the value of the corporation, then acting loyally calls for means acting on that substantive belief and altering the corporation's business. But if the corporation has a limited purpose, then the directors cannot pursue the profit-maximizing option. The purpose clause limits the

---

*ultra vires* acts and the implications of Section 124 of the DGCL), *abrogated on other grounds by El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (rejecting *Carsanaro*'s analysis of post-merger derivative standing).

[98] *See* Rauterberg & Talley, *supra*, at 1090 (explaining that a Delaware corporation could "cabin the breadth of the [corporate opportunity] doctrine by narrowing the purpose articulated in its charter to specified lines of business, effectively using that scope limitation to cabin the reach of all corporate activity"); *cf.* Zenichi Shishido, *Conflicts of Interest and Fiduciary Duties in the Operation of a Joint Venture*, 39 Hastings L.J. 63, 94–95 (1987) (noting that a court cannot find a misappropriation of a corporate opportunity when the opportunity falls outside the scope of the corporation's purposes). For a decision illustrating the effect of a limited purpose provision in the context of a partnership, see *JER Hudson GP XXI LLC v. DLE Investors, LP*, 275 A.3d 755, 787–88 (Del. Ch. 2022) ("The partnership's purpose limits the general partner's authority and therefore circumscribes its fiduciary duties. . . . Because a general partner only has the authority to act in furtherance of the partnership's purpose, it cannot owe a duty inconsistent with that purpose.")

[99] *See generally Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *22 (Del. Ch. Apr. 14, 2017) (collecting authorities).

directors to the identified purpose, and they have no ability or obligation to pursue a contrary purpose.[100]

Through this mechanism, a limited purpose clause effectively modifies the orientation of the directors' fiduciary duties. Rather than being able to seek freely to maximize the value of the corporation, the board's options are constrained in a manner that inherently confers benefits on other stakeholders. If, for example, a corporation has the narrow purpose of pursuing only the business of operating a river ferry, then its directors cannot decide to exit that business and construct a toll bridge. In practice, the limitations imposed by the narrow purpose clause confer benefits on other stakeholders, such as workers in the ferry industry, customers who prefer ferries, and suppliers of ferry boats and tools and parts for the ferry industry.

The ability to specify a narrow corporate purpose has clear parallels to the ability of a trust agreement to specify a purpose for the trust or an agency agreement to specify a purpose for the agent. If the agreement creating the fiduciary relationship specifies a narrow purpose for the relationships, then the fiduciary must pursue that purpose selflessly and in a manner that the fiduciary subjectively believes is in the best interests of the beneficiaries, but he the fiduciary cannot deviate from the purpose. The clause thereby both orients the fiduciary's duties and constrains the fiduciary's freedom of action.

---

[100] *See JER Hudson*, 275 A.3d at 787–88 (explaining that narrow purpose clause in partnership agreement constrained ability of general partner to act and with it the general partner's fiduciary duties).

Section 102(a)(3) and the implications of a narrow purpose clause demonstrate that Sections 102(b)(7) and 122(17) do not occupy the field when it comes to fiduciary tailoring. Other means are available. That suggests in turn that the Covenant is not attempting the impermissible and is not facially invalid.

### iv. Section 141(a)

The next path for modifying fiduciary duties appears in Section 141(a) itself.[101] That section is the cornerstone of Delaware's board-centric regime, under which "directors,

---

[101] The use of Section 141(a) has been relatively unexplored by caselaw, but has been deployed by practitioners. A real world example is the tailoring of the charters of AT&T Inc. and Liberty Media Corporation after the former acquired the latter so as to preserve a broad sphere of action for John Malone and Liberty. For an allusion to that highly structured governance arrangement, *see Bank of New York Mellon Tr. Co. v. Liberty Media Corp.*, 29 A.3d 225, 228 (Del. 2011) (referring to a governance structure under which AT&T "allowed liberty to operate autonomously"). For a decision upholding tailoring under Section 141(a), see *Lerman v. Cohen*, 222 A.2d 800, 807–08 (Del. 1966) (enforcing charter provision that empowered general counsel to resolve board deadlocks; noting that although directors may not delegate their duty to manage the corporation, "there is no conflict with that principle where, as here, the delegation of duty, if any, is made not by the directors but by stockholder action under [section] 141(a), via the certificate of incorporation"). *See generally* Welch & Saunders, *supra*, at 856 ("Various scholars have compiled lists of aspects of Delaware corporation law they believe are mandatory. Some of these terms are not really mandatory because the same effect can be achieved through a different method. … Indeed, the very existence of the board of directors, which has sometimes been identified as a mandatory feature of the Delaware corporation, can be modified by provision in the certificate of incorporation adopted under [the Board Power Exception].""); Ernest L. Folk, III, *The Delaware General Corporation Law* 54 (1972) (citing *Lerman* as recognizing "the power of stockholders to establish any type of internal corporate structure they desire so long as it does not violate some other statutory provision or public policy. At the very least, there is nothing in the Delaware statute to require rigid adherence to the traditional corporate norm, and every reason to conclude that the statute and case law tolerate, if not actually encourage, deviations from the corporate norm which have a 'proper purpose.'").

53

rather than shareholders, manage the business and affairs of the corporation."[102] "The existence and exercise of [the board's authority under Section 141(a)] carries with it certain fundamental fiduciary obligations to the corporation and its shareholders."[103] Because the board's authority under Section 141(a) provides the foundation for the directors' fiduciary duties, it follows that modifying the board's authority under Section 141(a) should modify the directors' fiduciary duties.

Many practitioners can recite the first twenty-four words of Section 141(a) by heart. For present purposes, the next sixty-five words are more important. In its entirety, Section 141(a) states:

> The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation.[104]

Section 141(a) thus consists of a grant of authority followed by an exception. The first sentence gives the board nearly plenary authority over the business and affairs of the corporation "except as may be provided otherwise in this chapter or in its certificate of

---

[102] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (subsequent history omitted).

[103] *Id.*

[104] 8 *Del. C.* § 141(a).

incorporation" (the "Board Power Exception").[105] The Board Power Exception authorizes modifications to the board-centric regime that appear in the DGCL ("in this chapter") or the charter ("in its certificate of incorporation"). The second sentence confirms that if a modification appears it the charter, then the board's powers and duties "shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation."[106]

The Board Power Exception hearkens back to Section 102(b)(1), which states:

Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the governing body, members, or any class or group of members of a nonstock corporation; if such provisions are not contrary to the laws of this State.[107]

This provision explicitly authorizes a provision "defining, limiting and regulating the powers of . . . the directors." In *Salzberg*, the Delaware Supreme Court interpreted Section 102(b)(1) as "broadly enabling," with the only limitation found in the phrase "if such provisions are not contrary to the laws of this State."[108] Under this standard, a charter may depart from the common law "provided that it does not transgress a statutory enactment or a public policy settled by the common law or implicit in the General Corporation law

---

[105] *Id.*

[106] *Id.*

[107] 8 *Del. C.* § 102(b)(1).

[108] 227 A.3d at 115.

itself."[109] In *Manti*, the Delaware Supreme Court reiterated that the "public policy favoring private ordering" reflected in Section 102(b)(1) "allows a corporate charter to contain virtually any provision that is related to the corporation's governance," subject only to the requirement that it not be "contrary to the laws of this State."[110]

The Board Power Exception treats provisions that appear in the DGCL or in the charter as equally effective for tailoring the board's power and authority. It follows that extant statutory provisions should provide insight into what types of charter-based modifications are permissible and consistent with public policy.

One statutory exemplar appears in in Subchapter XIV of the DGCL, titled Close Corporations,[111] and authorizes a close corporation to provide for management by its stockholders.[112] When a corporation elects to be a close corporation and for the stockholders to manage some or all aspects of its business and affairs, the Board Power Exception comes into play to eliminate any conflict with Section 141(a) and confirm that the "business and affairs of [the] corporation . . . shall be managed . . . as . . . otherwise

---

[109] *Id.* (cleaned up).

[110] *Manti*, 261 A.3d at 1217.

[111] A close corporation under Subchapter XIV is not synonymous with "closely held corporation." The former is a specific type of corporation contemplated by the DGCL, like a non-stock corporation or a public benefit corporation. The latter is a colloquialism for a privately held corporation with relatively few stockholders.

[112] *See* 8 *Del. C.* § 351.

provided in this chapter."[113] Because the Board Power Exception treats statutory provisions and charter provisions as equally effective, charter-based allocations of the board's authority should be similarly permissible.

A second statutory exemplar also appears in Subchapter XIV and authorizes the holders of a majority of the outstanding stock entitled to vote in a close corporation to enter into a written agreement among themselves or with another party to "restrict or interfere with the discretion or powers of the board of directors."[114] The same provision states that such an agreement will "relieve the directors and impose upon the stockholders . . . the liability for managerial acts or omissions which is imposed on directors to the extent and so long as the discretion or powers of the board in its management of corporate affairs is controlled by such agreement."[115] Once again, the Board Power Exception comes into play to avoid any conflict with Section 141(a). By implication, a charter provision could deploy the authority provided by the Board Power Exception to "restrict or interfere with the discretion or powers of the board of directors."[116] A charter provision also could assign discretion and power otherwise enjoyed by the board of directors to another party, with the effect of relieving the directors and imposing on the other party the liability for managerial

---

[113] *Id.* § 141(a).

[114] *Id.* § 350.

[115] *Id.*

[116] *Id.*

acts or omissions which otherwise would be imposed on the directors to the extent and so long as the discretion or powers of the board are exercised by the other party.[117]

A third statutory exemplar appears in Subchapter XV of the DGCL, Public Benefits Corporations, where Section 361 authorizes the charter of a public benefit corporation to identify a public benefit, with the effect that the corporation "shall be managed in a manner that balances the stockholders' pecuniary interests, the best interests of those materially affected by the corporation's conduct, and the public benefit or public benefits identified in its certificate of incorporation."[118] Both the authority provided for narrow purpose provisions in Section 102(a)(3) and the Board Power Exception suggest that a comparable charter provision would be permissible. This decision has already discussed how a narrow purpose provision can channel a board's power and associated fiduciary duties to confer benefits on stakeholders. The Board Power Exception provides a route for orienting fiduciary duties explicitly.

The ability to tailor a board's authority and concomitant fiduciary duties using the Board Power Exception parallels the ability of a trust agreement to provide specific instructions to the trustee or to name specific beneficiaries whose interests the trustee must serve. It likewise parallels the ability of an agency agreement to provide specific instructions to an agent, including parameters for carrying out the agent's duties. Those

---

[117] *See id.*

[118] *See id.* § 362(a).

fiduciary antecedents and existence of the statutory exemplar in Section 361 suggest other possible use cases, such as shifting the fiduciary maximand from equity value to enterprise value,[119] or authorizing conditions for a board to extend a dual-class capital structure beyond an existing sunset without generating a loyalty issue that would trigger entire fairness review.[120] The Board Power Exception shows that the DGCL provides greater space for fiduciary tailoring than is commonly understood.[121]

---

[119] *See Trados*, 73 A.3d at 56 n.32.

[120] *Cf.* David J. Berger, Jill E. Fisch, & Steven Davidoff Solomon, *Extending Dual Class Stock: A Proposal* (U. Pa. Inst. L. & Econ. Rsch. Paper, No. 13, 2023), *available at* https://ssrn.com/abstract=4399551.

[121] To the extent using Section 102(a)(3) or the Board Power Exception to reorient or tailor fiduciary duties seems extreme, consider a thought experiment in which the General Assembly still granted corporate charters by special act. The General Assembly undoubtedly would have the power to provide for this type of reorientation or tailoring. Under the Constitution of 1897, the General Assembly no longer grants charters by special act; the DGCL is the sole means of obtaining a corporate charter. Del. Const. art IX §§ 1–2. What then are the restrictions on how private actors can deploy the state's chartering power? If a provision in the DGCL expressly forecloses a DGCL charter from accomplishing a result that previously could be accomplished by special act, then obviously the General Assembly has withheld that authority. For example, no corporation formed under the DGCL after April 18, 1945, may confer academic or honorary degrees. 8 *Del. C.* § 125. No corporation formed under the DGCL can exercise banking power. 8 *Del. C.* § 126(a). A Delaware corporation that is designated as a private foundation under the Internal Revenue Code must comply with certain tax provisions, unless its charter provides that the restriction is inapplicable. 8 *Del. C.* § 127. A corporation cannot include a provision in its charter that is contrary to Section 102(b)(7), and a charter "may not contain any provision that would impose liability on a stockholder for the attorneys' fees or expenses of the corporation or any other party in connection with an internal corporate claim." 8 *Del. C.* § 102(f). The requirements for naming a Delaware corporation reflect more trivial restriction on the ability of private actors to deploy state power. *See* 8 *Del. C.* § 101(a)(1).

Because the Board Power Exception only applies to a charter provision, it does not

bear directly on the Covenant. It nevertheless provides further evidence that the DGCL

provides greater space for fiduciary tailoring than is commonly understood. That flexibility

suggests that the Covenant is not contrary to public policy and is not facially invalid.

---

Except where explicit restrictions apply, the chartering power under the DGCL would seem co-extensive with the chartering power that the General Assembly could exercise by special act. From that standpoint, the fact that the General Assembly enacted subchapters of the DGCL that *confirmed* the ability of corporate planners to use the DGCL to charter close corporations and public benefit corporations eliminated any doubt on that subject, but it does not imply that the power did not already exist. Section 102(a)(3), and the Board Power Exception, and Section 102(b)(1) indicate that it did.

This court's decision in *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1 (Del. Ch. 2010), is not to the contrary. There, the court rejected an attempt by corporate fiduciaries to operate a Delaware corporation for an eleemosynary purpose:

> The corporate form in which craigslist operates, however, is not an appropriate vehicle for purely philanthropic ends, at least not when there are other stockholders interested in realizing a return on their investment. Jim and Craig opted to form craigslist, Inc. as a for-profit Delaware corporation and voluntarily accepted millions of dollars from eBay as part of a transaction whereby eBay became a stockholder. Having chosen a for-profit corporate form, the craigslist directors are bound by the fiduciary duties and standards that accompany that form. Those standards include acting to promote the value of the corporation for the benefit of its stockholders. The "Inc." after the company name has to mean at least that.

*Id.* at 34. The charter of craigslist did not contain a narrow purpose clause or a provision that sought to deploy the authority provided by the Board Power Exception or Section 102(b)(1) to reorient the board's fiduciary duties. The controllers of the corporation simply asserted that they were pursuing a philanthropic purpose, which was a confession as stark as Henry Ford's insistence on benefiting his workers. *Dodge v. Ford Motor Co.*, 170 N.W. 668, 683–84 (Mich. 1919); *see* M. Todd Henderson, *The Story of* Dodge v. Ford Moto Company: *Everything Old Is New Again*, *in* Corporate Law Stories 37–76 (J. Mark Ramseyer ed., 2009). Without any charter-based fiduciary tailoring, the *eBay* analysis is spot on.

### v. Section 145

The next DGCL provision does not accommodate fiduciary tailoring, but rather authorizes limitations on fiduciary accountability. Section 145 permits a Delaware corporation to provide indemnification and obtain insurance. Exculpation, indemnification, and insurance are means of protecting fiduciaries against the consequences of misconduct. With exculpation, monetary damages are prohibited. With indemnification, the corporation picks up the tab. With insurance, a third party pays. There are obviously differences in implementation and operation,[122] but to the extent each is fully available, the endpoint is the same: the fiduciary does not bear the financial consequences of breach.[123]

---

[122] For example, the insolvency of the corporation can render indemnification ineffective, just as the insolvency of a third-party insurer can render insurance ineffective. For insurance coverage, market availability and pricing are additional constraints. For purposes of fiduciary duty litigation, the biggest difference among the three is that exculpation operates as a pleading-stage defense, akin to sovereign immunity. *See In re Ezcorp Inc. Consulting Agr. Deriv. Litig.*, 130 A.3d 934, 940 (Del. Ch. 2016). Indemnification only comes into effect after final disposition of the case, although advancement can cover attorneys' fees and expenses in the interim. *See Sun-Times Media Gp., Inc. v. Black*, 954 A.2d 380, 391 (Del. Ch. 2008). Insurance can provide both for indemnification of liabilities and coverage of litigation expenses. Robert P. Redemann & Michael F. Smith, *Law and Prac. of Ins. Coverage Litig.* § 4:19, Westlaw (database updated July 2022) ("It is well established that the insurer may be obligated to pay the costs of defending a suit against the insured, although these expenses may bring the total amount paid beyond the coverage limits set out in the policy. Courts have read the standard duty to defend language in general liability agreements very broadly to include all costs and fees reasonably related to defending the underlying litigation." (footnotes omitted)).

[123] *See generally* Joan MacLeod Heminway, *Corporate Purpose and Litigation Risk in Publicly Held U.S. Benefit Corporations*, 40 Seattle U. L. Rev. 611, 634 (2017) ("As a general matter, assuming a viable fiduciary duty claim, the liability or financial responsibility of corporate directors for breaches of fiduciary duty may be narrowed through the application of up to four mandatory or permissive aspects of corporate law.

The parameters of Section 145 provide insight into the limits of Delaware public policy for loyalty breaches. Section 145(a) addresses indemnification for direct claims and authorizes a corporation to indemnify a director or officer for "expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding," as long as "the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation."[124] A corporation thus can indemnify a fiduciary for all expenses, including a judgment, incurred for a direct claim for a loyalty breach, as long as the fiduciary acted in good faith and reasonably believed that the decision was not opposed to the best interests of the corporation. Not only that, but

---

These include exculpation for breaches of the duty of care, indemnification (statutory and privately ordered), director and officer liability insurance, and the possible application of the business judgment rule in the judicial review process."); Todd M. Aman, *Cost-Benefit Analysis of the Business Judgment Rule: A Critique in Light of the Financial Meltdown*, 74 Alb. L. Rev. 1, 11 (2011) ("Exculpation provisions, indemnification, and insurance all operate to shield directors from liability risk to varying extents."); James E. Joseph, *Indemnification and Insurance: The Risk Shifting Tools (Part I)*, 79 Pa. Bar Ass'n Q. 156, 156 (2008) (describing indemnification, exculpation, and insurance as "risk shifting tools"); Welch & Saunders, *supra*, at 860 (citing the power to obtain insurance under Section 145(g) as a provision in the DGCL that "provide[s] some measure of protection to directors for approving transactions that might otherwise be seen as a breach of the duty of loyalty"); E. Norman Veasey, Jesse A. Finkelstein & C. Stephen Bigler, *Delaware Supports Directors with A Three-Legged Stool of Limited Liability, Indemnification, and Insurance*, 42 Bus. Law. 399, 421 (1987) (describing the triad of exculpation, indemnification, and insurance as a "'three-legged' approach to director/officer protection . . . designed to ensure that directors and officers are adequately protected from liability resulting from the performance of their duties").

[124] 8 *Del. C.* § 145(a).

> [t]he termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation.[125]

Like Section 145(a), the Covenant addresses direct claims. By analogy to Section 145(a), the Covenant could operate as a permissible limitation on fiduciary accountability as long as it does not foreclose a claim where the fiduciary acted in bad faith or had an unreasonable belief that the decision could be at least not opposed to the interests of the corporation. The defendants in this case undoubtedly will argue (and intimated in briefing the motion to dismiss) that they acted in good faith both when engaging in the Interested Transactions and when effectuating the Drag-Along Sale. The possibility that the Covenant could operate validly to foreclose that type of claim indicates that it is not facially invalid.

---

[125] *Id.* Section 145(c) goes further by providing for mandatory indemnification regardless of the fiduciary's mental state. That section states a director or officer "shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred" in connection with an action, suit, or proceeding, "[t]o the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise." *Id.* Any dismissal of a claim for any reason constitutes success "on the merits or otherwise" and triggers mandatory indemnification. *Id.* "Whether an individual acted in good faith or what she perceived to be in the corporation's best interests is irrelevant in the context of that provision." *Evans v. Avande, Inc.*, 2021 WL 4344020, at *3 (Del. Ch. Sept. 23, 2021). A director charged with criminal conduct who escapes on a technicality is entitled to full indemnification under Section 145(c). *See Cochran v. Stifel Fin. Corp.*, 2000 WL 1847676, at *9 (Del. Ch. Dec. 13, 2000) (Strine, V.C.), *aff'd in pertinent part, rev'd in part on other grounds*, 809 A.2d 555 (Del. 2002). The Covenant does not operate analogously to Section 145(c) because the Covenant protects the defendants in the absence of a favorable adjudication.

For purposes of insurance, Section 145(g) does not impose any limitations.[126] Recent amendments to Section 145(g) permit a corporation to form its own captive insurer and provide insurance for all claims except "(i) personal profit or other financial advantage to which such person was not legally entitled or (ii) deliberate criminal or deliberate fraudulent act of such person, or a knowing violation of law by such person."[127] By analogy to Section 145(g), the Covenant could operate as a permissible limitation on fiduciary accountability as long the Interested Transactions and the Drag-Along Sale did not confer a "personal profit" to which the defendants "were not legally entitled," and as long as the defendants did not deliberately act with criminal or fraudulent intent. The possibility that the Covenant could operate validly to foreclose claims under those circumstances indicates that it is not facially invalid.

Section 145 does not speak directly to the Covenant, but by authorizing significant protection against some types of loyalty breaches, it suggests that much of the scope of the Covenant falls within the boundaries of Delaware public policy. Section 145 thus indicates that the Covenant is not facially invalid.

### vi.    Litigation-Limiting Provisions

Finally, two provisions in the DGCL limit claims for breach of fiduciary duty regardless of content. One is Section 327, which imposes the contemporaneous ownership

---

[126] *See* 8 *Del. C.* § 145(g).

[127] *Id.* § 145(g)(1).

64

rule and requires that a stockholder have owned stock at the time that the corporation suffered the wrong to have standing to assert a derivative claim.[128] Even if the wrong involved a self-dealing loyalty breach or bad faith conduct, the stockholder cannot sue.[129] Section 327 effectively operates as a covenant not to sue derivatively for wrongs predating the stockholder's purchase of shares.

A second litigation-limiting provision is Section 367, which appears in Subchapter XV addressing Public Benefit Corporations. That section states:

> Any action to enforce the balancing requirement of § 365(a) of this title, including any individual, derivative or any other type of action, may not be brought unless the plaintiffs in such action own individually or collectively, as of the date of instituting such action, at least 2% of the corporation's outstanding shares or, in the case of a corporation with shares listed on a national securities exchange, the lesser of such percentage or shares of the

---

[128] For reasons that I have discussed elsewhere, I do not believe that a coherent and credible policy justification has ever been offered for the contemporaneous ownership requirement. *See* J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 Del. J. Corp. L. 673 (2008). The requirement was created by the Supreme Court of the United States to address the problem of the collusive federal diversity jurisdiction, and state courts (including this court) consistently rejected efforts to inject it into state corporate law. *See Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 177–80 (Del. Ch. 2014) (collecting authorities). The Delaware General Assembly enacted Section 327 in 1945, after New York's implementation of a similar provision under circumstances that smack of anti-Semitism. *See Bamford v. Penfold, L.P.*, 2020 WL 967942, at *24 n.18 (Del. Ch. Feb. 28, 2020); Lawrence E. Mitchell, *Gentleman's Agreement: The Antisemitic Origins of Restrictions on Stockholder Litigation*, 36 Queen's L.J. 71, 72 & n.1 (2010). The ill-fitting justifications that subsequent courts have offered read like rationalizations, making Section 327 a provision that cries out for reexamination. *See SDF Funding LLC v. Fry*, 2022 WL 1511594, at *6 (Del. Ch. May 13, 2022) (calling for the General Assembly to revisit Section 327).

[129] *E.g.*, *In re SmileDirectclub, Inc. Deriv. Litig.*, 2021 WL 2182827, at *12 (Del. Ch. May 28, 2021), *aff'd*, 270 A.3d 239 (Del. 2022); *7547 P'rs v. Beck*, 1995 WL 106490, at *2 (Del. Ch. Feb. 24, 1995), *aff'd*, 682 A.2d 160 (Del. 1996)

corporation with a market value of at least $2,000,000 as of the date the action is instituted.[130]

The plain language of the ownership requirement applies even if the wrong involves a loyalty breach or bad faith conduct. For public benefit corporations, Section 367 operates as a covenant not to sue unless the stockholder can meet the ownership threshold.

Sections 327 and 367 demonstrate that Delaware law does not prohibit limitations on loyalty claims. Both sections apply to all stockholders and encompass all claims for breach of fiduciary duty, regardless of subject matter. The Covenant is far narrower: It only restricts the Signatories and only applies to a Drag-Along Sale. Compared to Sections 327 and 367, the Covenant attempts less. The presence of Sections 327 and 367 in the DGCL indicate that the Covenant is not facially invalid. [131]

---

[130] 8 *Del. C.* § 367.

[131] In addition to the provisions discussed in this section, the Delaware Supreme Court held in *Glassman v. Unocal Exploration Corp.*, 777 A.2d 242 (Del. 2001), that the short-form merger statute forecloses a stockholder's ability to assert a claim for breach of the duty of loyalty that could trigger entire fairness review:

> By enacting a statute [8 *Del. C.* § 253] that authorizes the elimination of the minority without notice, vote, or other traditional indicia of procedural fairness, the General Assembly effectively circumscribed the parent corporation's obligations to the minority in a short-form merger. The parent corporation does not have to establish entire fairness, and, absent fraud or illegality, the only recourse for a minority stockholder who is dissatisfied with the merger consideration is appraisal.

*Id.* at 243. Section 253 is thus another example of a DGCL provision that limits loyalty claims.

### b. Common Law Tailoring

The preceding discussion addressed statutorily authorized paths for fiduciary tailoring. The common law goes further and authorizes outcomes comparable to what the Covenant achieves. The existence of common law doctrines that authorize similar outcomes strongly indicates that the Covenant is not facially invalid.

### i. Contractual Preemption Of Fiduciary Claims

One powerful common law doctrine asserts that contractual obligations preempt overlapping fiduciary duty claims that arise out of the same set of facts. In *Nemec*, the leading case, the Delaware Supreme Court stated:

> It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous.[132]

The stockholder plaintiffs contended that the defendant directors acted in their own self-interest when they caused the corporation to exercise a contractual right to redeem the

_____

The outcome in *Glassman* reflected a conscious decision by the Delaware Supreme Court to change the law. Two decades earlier, the Delaware Supreme Court had reached precisely the opposite conclusion and rejected the same arguments that *Glassman* accepted. *See Roland Int'l Corp. v. Najjar*, 407 A.2d 1032, 1036 (Del. 1979) ("The short form permitted by [Section] 253 does simplify the steps necessary to effect a merger, and does give a parent corporation some certainty as to result and control as to timing. But, we find nothing magic about a 90% ownership of outstanding shares which would eliminate the fiduciary duty owed by the majority to the minority."). The *Glassman* decision reinforces the conclusion that limiting duty of loyalty claims is not inherently contrary to Delaware public policy, which implies that the Covenant is not facially invalid.

[132] *Nemec*, 991 A.2d at 1129.

plaintiffs' shares. By exercising the redemption right, the directors deprived the plaintiffs of greater consideration from a then-anticipated transaction.[133] The consideration went to the remaining stockholders, including the directors. The Delaware Supreme Court held that the contractual right preempted the fiduciary claim.[134]

Other decisions likewise hold that a claim for breach of contract occupies the field and preempts overlapping claims for breach of duty against corporate fiduciaries.[135] For

---

[133] *Id.* at 1125.

[134] *Id.* at 1128–29.

[135] *See In re WeWork Litig.*, 2020 WL 6375438, at *12 (Del. Ch. Oct. 30, 2020); *Ogus v. SportTechie, Inc.*, 2020 WL 502996, at *11 (Del. Ch. Jan. 31, 2020); *MHS Cap. LLC v. Goggin*, 2018 WL 2149718, at *8 (Del. Ch. May 10, 2018); *Veloric v. J.G. Wentworth, Inc.*, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014); *Blaustein v. Lord Balt. Cap. Corp.*, 2013 WL 1810956, at *13 (Del. Ch. Apr. 30, 2013), *aff'd*, 84 A.3d 954 (Del. 2014). Sometimes, the authorities cited in the corporate decisions can be traced back to one or more decisions addressing an alternative entity, but the corporate decisions invariably articulate the concept of contractual preemption as a general principle of Delaware law and do not limit its application to the alternative entity context. *See, e.g.*, *Stewart v. BF Bolthouse Holdco, LLC,* 2013 WL 5210220, at *12 (Del. Ch. Aug. 30, 2013) (asserting generally that "Delaware law recognizes the primacy of contract law over fiduciary law."); *Seibold v. Camulos P'rs LP*, 2012 WL 4076182, at *21 (Del. Ch. Sept. 17, 2012) ("It is settled that an agent may not misuse the confidential information of its principal. Here, however, Camulos' claim that Seibold breached his fiduciary duty by misusing confidential information alleges facts identical to Camulos' claim that Seibold breached his contractual duties by misusing Confidential Information, and is thus foreclosed as superfluous." (cleaned up); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *4 (Del. Ch. Oct. 19, 2004) ("Because of the primacy of contract law over fiduciary law, if the duty sought to be enforced arises from the parties' contractual relationship, a contractual claim will preclude a fiduciary claim. This manner of inquiry permits a court to evaluate the parties' conduct within the framework created and crafted by the parties themselves. Because the four fiduciary duty counts in the complaint arise not from general

example, when addressing the implication of a voting agreement, one decision summarized

the rule as follows:

> Under Delaware law, if the contract claim addresses the alleged wrongdoing by the director, any fiduciary duty claim arising out of the same conduct is superfluous. The reasoning behind this is that to allow a fiduciary duty claim to coexist in parallel with a contractual claim, would undermine the primacy of contract law over fiduciary law in matters involving contractual rights and obligations.[136]

The court posited that fiduciary duty claims could only persist under "a narrow exception"

that applies when "there is an independent basis for the fiduciary duty claims."[137]

---

fiduciary principles, but from specific contractual obligations agreed upon by the parties, the fiduciary duty claims are precluded by the contractual claims." (footnotes omitted)).

A related line of authority holds that when a corporate fiduciary exercises its rights as a creditor, the fiduciary acts free of fiduciary constraint. *See Odyssey P'rs, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 414 (Del. Ch. 1999); *Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995) (Allen, C.), *aff'd*, 672 A.2d 35 (Del. 1996). *See generally In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 409 (Del. Ch. 2010) (discussing *Odyssey Partners* and *Solomon*).

[136] *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010) (cleaned up).

[137] *Id.* Isolated decisions, including my own, have pushed back against the concept of contractual preemption. *E.g.*, *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 857–58 (Del. Ch. 2022); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 806 (Del. Ch. 2022); *ODN Hdlgs.*, 2017 WL 1437308, at *24; *Lee v. Pincus*, 2014 WL 6066108, at *7–9 (Del. Ch. Nov. 14, 2014). Scholars explain that a contract claim can coexist with a fiduciary duty claim, because fiduciary obligations overlay all of the rights and powers that the fiduciary can exercise. *See* Smith, *supra*, at 135 (describing fiduciary capacity as a "transversal concept: it cuts across the sources of legal powers, since those sources may be contractual or not"); Harding, *supra*, at 79 ("The fact that a fiduciary undertaking may be made in a given contract does not bear on what counts as sufficient performance of that undertaking as a matter of *contract* law. It instead means that non-performance of the undertaking is susceptible of analysis in more than one frame, as involving fiduciary breach

Under *Nemec*'s doctrine of contractual preemption, the Drag-Along Right displaces competing claims for breach of fiduciary duty. The Covenant becomes an unobjectionable belt-and-suspenders provision that confirms a result that Delaware law would already reach. That outcome suggests that the Covenant is facially invalid.

---

as well as breach of contract. Moreover, the promisor may be liable for fiduciary breach even in circumstances where she has fully performed her undertaking from the perspective of contract law." (footnote omitted)). Under this alternative to contractual preemption, a fiduciary can face both a claim for breach of contract and a claim for breach of fiduciary duty arising from the same conduct. *Metro Storage*, 275 A.3d at 858. "If the contract provides the sole source of the specific prohibition, then the plaintiff only can sue in contract, because the duty only arises from the contractual relationship. If, however, the plaintiff also would have a claim under general fiduciary principles, then the plaintiff also can assert the claim for breach of fiduciary duty." *Id.* Agency law illustrates this approach:

> The overlap between duties derived from tort law and from an agent's contract with the principal will often provide the principal with alternative remedies when a breach of duty subjects the agent to liability. In particular, an agent is subject to liability to the principal for all harm, whether past, present, or prospective, caused the principal by the agent's breach of the duties stated in this section.

Restatement of Agency, *supra*, § 8.08 cmt. b.

In *Nemec*, the fiduciary duty claim would have failed even without preemption, because (i) directors do not owe fiduciary duties to particular stockholders but rather to the stockholders as a collective, and (ii) when exercising the redemption right, the directors did not receive any benefit other than the value that accrued to them indirectly and pro rata as remaining stockholders. *See ODN Hdlgs.*, 2017 WL 1437308, at *17, *24. But *Nemec* went in a different direction and held that a contract claim preempts overlapping fiduciary duty claims arising from the same facts.

If Delaware law were to retreat from the contractual preemption of overlapping fiduciary claims, at least in the corporate context, that would not render the Covenant facially invalid. Through the Covenant, the Funds agreed not to exercise a stockholder right (the right to sue for breach of duty) that they could freely decline to assert. If the underlying right is preempted, then the Covenant is redundant and inoffensive. If the underlying right is not preempted, then the Funds still can commit not to exercise it.

70

### ii. Advance Ratification

The next common law doctrine is ratification, which permits stockholders to extinguish a claim for breach of fiduciary duty by authorizing an act that otherwise would constitute a breach. When a corporation does not have a controlling stockholder, a fully informed, non-coerced stockholder vote cleanses an interested transaction and changes the standard of review from entire fairness to an irrebuttable version of the business judgment rule where the only remaining challenge is waste.[138]

Stockholders can ratify specific types or classes of interested transactions in advance. The clearest example involves directors setting their own compensation, which is a self-dealing transaction implicating the duty of loyalty such that the directors bear the burden of showing that their compensation is entirely fair.[139] Directors cannot use advance ratification to give themselves a blank check, nor can they secure broad authority subject only to a cap. They can, however, obtain authorization for specific payments or for the use of a predictable formula.[140]

---

[138] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 308–09 (Del. 2015). The waste challenge is more theoretical than realistic, because a waste claim contends that the transaction was on terms that no rational person would approve. When stockholders have ratified a transaction in a fully informed and non-coerced vote, they have demonstrated that rational people could approve the transaction. *See In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *19 (Del. Ch. Oct. 10, 2016).

[139] *In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1222 (Del. 2017).

[140] *Id.* at 1222.

The doctrine of advance ratification has obvious parallels to the concept of advance authorization in trust law or agency law. Advance authorization permits a fiduciary to engage in a transaction that otherwise would constitute a breach of duty. Advance ratification does the same thing.

The Covenant functions like advance ratification. Through the Covenant, the Funds agreed in advance to a Drag-Along Sale. The Funds did not give the defendants a blank check. They only agreed not to sue over a transaction that met eight specific criteria. Viewed in this manner, the Covenant accomplishes what advance ratification already allows. The doctrine of advance ratification indicates that the Covenant is not facially invalid.

### iii.     Laches

The final common law doctrine is laches. Unless a tolling doctrine applies or other extraordinary circumstances exist, laches bars a stockholder plaintiff from asserting a claim for breach of fiduciary duty if more than three years have passed since the claim accrued.[141] It does not matter whether the claim involves a loyalty breach or bad faith conduct.[142]

Stated more generally, a stockholder can choose not to assert a claim for fiduciary duty, and if the stockholder waits long enough, the claim is lost. Through the Covenant,

---

[141] *Lebanon Cnty. Empls.' Ret. Fund v. Collis*, 287 A.3d 1160, 1194–95 (Del. Ch. 2022).

[142] *Id.* at 1219.

the Funds agreed to that outcome in advance. From that standpoint, the Covenant is not facially invalid, but rather unexceptional.

### c. Summing Up The Corporate Law Limitations

Delaware corporate law provides more space for fiduciary tailoring than is commonly understood. Several of those paths authorize outcomes comparable to what the Covenant achieves. Section 122(17) authorizes advance renunciation of corporate opportunities, which is equivalent to a covenant not to sue for usurpation of the renounced opportunities. The Covenant operates similarly. The common law doctrine of contractual preemption indicates that the Drag-Along Right may already foreclose a loyalty claim, leaving the Covenant as an unobjectionable add-on. Both the common law doctrine of advance ratification and the Covenant foreclose litigation over a specific transaction. Finally, the comparison to laches shows that the Funds simply agreed in advance to do something they could do of their own volition: give up their claims by declining to sue. These options make it difficult to say that the Covenant violates Delaware public policy and is facially invalid.

### 3. The Contractarian Framework And Private Ordering

The next step in the analysis is the role of contract. "Contractual and fiduciary relationships are the two dominant legal forms of interaction through which persons can pursue individual and shared interests."[143] Although often perceived as constituting

---

[143] Contract and Fiduciary Law, *supra*, at 1.

separate domains, the boundaries between the fields are fluid rather than fixed, and the two areas, "while distinctive, are deeply intertwined."[144]

### a. The Power Of Private Ordering

To say that Delaware prides itself on the contractarian nature of its law risks understatement:

> This jurisdiction respects the right of parties to freely contract and to be able to rely on the enforceability of their agreements; where Delaware's law applies, with very limited exceptions, our courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering, both in recognition of a right to self-order and to promote certainty of obligations and benefits.[145]

"Sophisticated parties" can and should "make their own judgments about the risk they should bear," and Delaware courts are "especially chary about relieving sophisticated business entities of the burden of freely negotiated contracts."[146]

Within this framework, public policy plays a limited role. "When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than

---

[144] *Id.* at 1–2.

[145] *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015).

[146] *Abry P'rs*, 891 A.2d at 1061–62.

freedom of contract."[147] More significant interests "are not to be lightly found, as the wealth-creating and peace-inducing effects of civil contracts are undercut if citizens cannot rely on the law to enforce their voluntarily-undertaken mutual obligations."[148]

> [T]he right to contract is one of the great, inalienable rights accorded to every free citizen. . . . "If there is one thing more than any other which public policy requires it is that men of full age and competent understanding shall have the utmost liberty of[]contracting" and that this freedom of contract shall not lightly be interfered with. We also recognize that freedom of contract is the rule and restraints on this freedom the exception, and to justify this exception unusual circumstances should exist.[149]

Delaware courts will "not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both."[150]

Delaware's embrace of contractarianism extends to the corporate form, where it manifests as the concept of private ordering.[151] "Delaware's corporate statute is widely

---

[147] *Libeau v. Fox*, 880 A.2d 1049, 1056 (Del. Ch.), *aff'd in part, rev'd in part on other grounds*, 892 A.2d 1068 (Del. 2006).

[148] *Id.* at 1056–57.

[149] *State v. Tabasso Homes*, 28 A.2d 248, 252 (Del. Gen. Sess. 1942) (citations omitted).

[150] *Nemec*, 991 A.2d at 1126.

[151] *See generally* Mohsen Manesh, *The Corporate Contract and the Internal Affairs Doctrine*, 71 Am. L. Rev. 501, 526–34 (2021) (describing Delaware's contractarian approach to corporate law); Megan Wischmeier Shaner, *Interpreting Organizational "Contracts" and the Private Ordering of Public Company Governance*, 60 Wm. & Mary L. Rev. 985, 1010 (2019) ("[I]n Delaware, the courts have embraced and endorsed the contract metaphor, holding that contract law presides over issues involving both the

regarded as the most flexible in the nation because it leaves the parties to the corporate contract (managers and stockholders) with great leeway to structure their relations, subject to relatively loose statutory constraints and to the policing of director misconduct through equitable review."[152] "Our law strives to enhance flexibility in order to engage in private ordering[, and] our DGCL was intended to provide directors and stockholders with flexibility and wide discretion for private ordering and adaptation to new situations."[153] Other decisions similarly stress the "great flexibility" that the DGCL provides and its role as "an enabling statute."[154]

---

enforcement and interpretation of the charter and bylaws."); Jill E. Fisch, *Governance by Contract: The Implications for Corporate Bylaws*, 106 Cal. L. Rev. 373, 380 (2018) ("Delaware courts have largely accepted the contractual theory of corporate law."); George Geis, *Ex-Ante Corporate Governance*, 41 J. Corp. L. 609, 611 (2016) ("[T]he influential Delaware courts seem to be taking a more permissive attitude, based in part on the parallels between contract law and the corporate relationship.").

[152] *Salzberg*, 227 A.3d at 116 (cleaned up).

[153] *Id.* at 137.

[154] *Shintom Co. v. Audiovox Corp.*, 888 A.2d 225, 227 (Del. 2005) (describing the DGCL as "an enabling statute that provides great flexibility for creating the capital structure of a Delaware corporation"); *accord In re Topps Co. S'holders Litig.*, 924 A.2d 951, 958 (Del. Ch. 2007) (Strine, V.C.); *Jones Apparel Gp., Inc. v. Maxwell Shoe Co., Inc.*, 883 A.2d 837, 845 (Del. Ch. 2004) (Strine, V.C.); *see Matter of Appraisal of Ford Hldgs., Inc. Preferred Stock*, 698 A.2d 973, 976 (Del. Ch. 1997) (Allen, C.) (explaining that "unlike the corporation law of the nineteenth century, modern corporation law contains few mandatory terms; it is largely enabling in character").

The contractarian theory of the corporation envisions the firm as a nexus of explicit and implicit contracts.[155] Under the contractarian approach, "[c]orporate law—and in particular the fiduciary principle enforced by courts—fills in the blanks and oversights [in the corporate contract] with the terms that people would have bargained for had they anticipated the problem and been able to transact costlessly in advance."[156] Because fiduciary duties function in this framework as default rules in an otherwise incomplete corporate contact, parties can modify them by agreement. "On this view corporate law

---

[155] *See*, *e.g.*, Stephen M. Bainbridge, *Community and Statism: A Conservative Contractarian Critique of Progressive Corporate Law Scholarship*, 82 Cornell L. Rev. 856, 859 (1997) ("'[C]ontractarians' model the firm not as a single entity, but as an aggregate of various inputs acting together with the common goal of producing goods or services."); Henry N. Butler & Larry E. Ribstein, *State Anti-Takeover Statutes and the Contract Clause*, 57 U. Cin. L. Rev. 611, 616 (1988) ("According to the contractual theory of the corporation, the corporation, like any firm—whether a sole proprietorship, partnership or corporation—is a nexus of contracts among many different parties involving mutually beneficial exchanges."); Frank H. Easterbrook & Daniel R. Fischel, *The Corporate Contract*, 89 Colum. L. Rev. 1416, 1418 (1989) ("The corporation is a complex set of explicit and implicit contracts, and corporate law enables the participants to select the optimal arrangement for the many different sets of risks and opportunities that are available in a large economy."); Roberta Romano, *Metapolitics and Corporate Law Reform*, 36 Stan. L. Rev. 923, 933 (1984) ("The contract approach regards the corporation as a shell or form created by consenting individuals. A firm is a nexus of explicit and implicit contracts, facilitating the implementation of the contracting parties' wishes."). For recent critiques of contractarianism, see Klass, *supra*, at 93–115; Smith, *supra*, at 117–38; and Irit Samet, *Fiduciary Law as Equity's Child*, in Contract and Fiduciary Law 119–66. For an earlier critique, see Victor Brudney, *Corporate Governance, Agency Costs, and the Rhetoric of Contract*, 85 Colum. L. Rev. 1403, 1444 (1985) (explaining that theories of the corporation as "a 'nexus of contracts' . . . embody serious descriptive inaccuracies, which, in turn, infect the normative consequences implicitly suggested by a regime of private autonomy").

[156] Easterbrook & Fischel, *supra*, at 1444–45.

supplements but never displaces actual bargains—save in situations of third-party effects or latecomer terms."[157] For the contractarian theory of corporate law, fiduciary duties are not immutable, mandatory terms but rather freely modifiable defaults.[158]

Delaware's embrace of contractarianism suggests that the Covenant is not facially invalid. Under the contractarian approach, state law—including the law of fiduciary

---

[157] *Id.* at 1445.

[158] Easterbrook & Fischel, *supra*, at 1445; *see* Henry N. Butler & Larry E. Ribstein, *Opting Out of Fiduciary Duties: A Response to the Anti-Contractarians*, 65 Wash. L. Rev. 1, 6 (1990) ("[T]he existence of fiduciary duties and remedies for breach should be viewed as part of this contractual protection rather than contrary to the contractual theory of the corporation."); *id.* at 19 ("While anti-contractarian writers see these duties as mandatory rules that supplement private ordering, under our analysis, fiduciary duties and remedies are actually part of this contract. It follows that shareholders should be free to alter these duties and remedies by agreement."); *id.* at 28 ("An important aspect of the contract theory of the corporation . . . is that fiduciary duties are a term of the corporate contract and therefore consensual in nature."); *see also* John C. Coffee, Jr., *The Mandatory/Enabling Balance in Corporate Law: An Essay on the Judicial Role*, 89 Colum. L. Rev. 1618, 1623 (1989) (arguing for treating fiduciary duties as defaults but permitting optout "when [courts] can find that the term has been accurately priced," meaning that "the actual operation of the provision must be relatively clear and specific and not simply confer on management a right to behave in a way that market forces or moral standards would usually constrain"); *see generally* J. William Callison, *Seeking an Angle of Repose in U.S. Business Organization Law: Fiduciary Duty Themes and Observations*, 77 U. Pitt. L. Rev. 441, 469 (2016) ("A contractarian model of fiduciary law, which emphasizes the origin of the business association as an agreement of its owners and conceives of fiduciary duties as a form of the parties' contract, has become American law's conventional wisdom over the last several decades. This contractarian approach to fiduciary law is related to an economic perspective describing business firms as a 'nexus of contracts' among the firm's constituencies, including owners, employees, creditors, suppliers, managers, and the public."). For an example of a contractarian approach to the duty of loyalty, see Ian Ayres & Joe Bankman, *Substitutes for Insider Trading*, 54 Stan. L. Rev. 235, 267–75 (2001) (proposing "a default prohibition against insider trading by the firm (or its non-managerial delegate)" with the power to opt out in the certificate of incorporation).

duties—supplies contractable defaults. There are accounts of the corporation that incorporate mandatory, non-waivable fiduciary duties, but they are not contractarian ones.[159] From a contractarian standpoint, there is nothing wrong with parties contracting

---

[159] *See, e.g.*, Melvin A. Eisenberg, *The Structure of Corporation Law*, 89 Colum. L. Rev. 1461, 1469–70, 1480–85 (1989) (arguing that "core" fiduciary duties should be mandatory in both closely held and public corporations); Jeffrey N. Gordon, *The Mandatory Structure of Corporate Law*, 89 Colum. L. Rev. 1549, 1554, 1593–97 (1989) (arguing for mandatory fiduciary duties for directors, officers, and controlling stockholders; explaining "contractarianism is not an adequate account of corporate law, and that despite contractarian strands, large chunks of corporate law continue to serve goals other than private wealth maximization" and include "procedural, power allocating, economic transformative, and fiduciary standards setting").

When it comes to corporate theory, I am not a contractarian. My conception of the corporation (and entity law generally) starts from the proposition that jural entities like corporations are creations of state power, and they have characteristics that only the state can provide, such as separate legal existence, presumptively perpetual life, limited liability for investors, the ability to contract and own property, and access to the judicial system, which gives them the ability to invoke the power of the state to obtain redress for injuries and enforce commitments. Jural entities are thus never wholly creatures of contract. Nor are they a nexus of contracts. However attractive that metaphor might be for economic modeling, entities are reified constructs. It is only because they are reified (personified) that they can move through the legal landscape.

This is a type of concession theory. *See* Manesh, *supra*, 535–47. But concession theory is only a starting point, because it leaves open the question of what the state has created when it charters an entity. The answer is an autonomous form of intangible property, with biological humans serving as the ghost in the machine that enables the form of property to engage with the world. Someday, artificial intelligence may animate corporations, but for now only biological humans can make decisions on their behalf and cause them to act. The resulting theory of the corporation starts with concession theory and adds a superstructure of property rights, so let's call it modern concession theory (MCT).

Because of the state's role in creating, maintaining, and eventually terminating the entity, the state has a persistent policy interest in establishing its characteristics, including what the entity can do and how it operates. But the state's persistent policy interest does not mean that MCT carries a pre-determined set of political commitments. Different

jurisdictions can charter entities with different public policy visions. Delaware charters entities with a vision of providing significant freedom for private ordering, which MCT easily accommodates. Unlike contractarianism, MCT also explains why the state can and does impose limits on private ordering. *See* Manesh, *supra*, at 539 (describing MCT's ability to explain "facets of contemporary corporate law that conflict with pure contractarianism," including a "mandatory fiduciary duty of loyalty"); *see also In re Coinmint, LLC*, 261 A.3d 867, 908–13 (Del. Ch. 2021) (discussing role of state in creating a jural entity and its implications for a jurisdiction's power to dissolve an entity created by another state).

While accommodating private ordering, MCT acknowledges limitations on what a state can use entity law to accomplish. *See* Manesh, *supra*, at 541–43. Because an entity is a form of autonomous property that the state creates, the state can define its attributes, the interrelationships among its component parts, and the internal processes by which it acts (or the methods by which parties can select attributes, form interrelationships, and establish internal processes). The state does not, however, act in a vacuum. Just like real property in the physical world, an autonomous entity has borders, and there can be other jurisdictions on the other side of those borders. In those situations, the requirements for passage must be co-created with other sovereigns. Our neighbor to the north can determine what is required to enter Canadian soil, but the United States can dictate what is required to leave American soil. There are also senior sovereigns whose law dominates (preempts) the law of junior sovereigns. Within our own republic, the United States Constitution and the protection for interstate travel secured by Privileges & Immunities Clause dominate the ability of Delaware and Pennsylvania to regulate their shared boundary.

The concepts of borders and trans-border domains provide helpful analogies for the limits on what a state can regulate through its power to create an entity. Consider the limits on a state's ability to regulate real property. Even if the General Assembly enacted legislation that purported to govern all of the Delmarva peninsula, those statutes would have no effect south of the Transpeninsular Line, east of the low tide mark of the Delaware River, or west of Tangent Line.

The contrast between the Delaware Supreme Court's decision in *Salzberg* and my trial-level ruling illustrates how contractarianism and MCT can lead to different results. The Delaware Supreme Court grounded its analysis on Section 102(b)(1) and whether a federal forum provision came within the plain language of that statutory section. *See Salzberg*, 227 A.3d at 115–16. After determining that it did, the Delaware Supreme Court held that the provision was authorized by statute and therefore valid. *Id.* at 125. At the trial level, I was concerned about whether Delaware had the power to regulate a domain outside of the corporation's boundary, raising a threshold question about whether Section

80

over a stockholder's ability to assert a specified type of claim for breach of fiduciary duty. The Covenant is therefore not facially invalid.

### b. Private Ordering And Stockholder Agreements

Delaware's commitment to contractarianism should be at its height when stockholders enter into agreements about how they will exercise stockholder-level rights, because at that level, individual owners are bargaining over their private property. Consistent with that intuition, the DGCL demonstrates that stockholders can agree to

---

102(b)(1) could be used by private actors to claim the ability to regulate that external space. *See Sciabacucchi v. Salzberg*, 2018 WL 6719718, at *2, *18–23 (Del. Ch. Dec. 19, 2018), *rev'd*, 227 A.3d 102 (Del. 2020). To continue the metaphor, I was concerned that Delaware both lacked authority to legislate about land north of the Twelve-Mile Circle and also could not grant its citizens the power to claim territory beyond that line.

By treating Section102(b)(1) as coextensive with the space that Delaware law can regulate (or authorize others to regulate), the Delaware Supreme Court embraced a strongly contractarian view of the corporation. Manesh, *supra*, at 505–08. Illustrating that contractarian foundation, the Delaware Supreme Court supported the ability of a forum selection provision to encompass federal securities law claims by relying on a decision that addressed a forum-selection provision in a private agreement. *See Salzberg*, 227 A.3d at 132 (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989)). I had not cited *Rodriguez*, because I viewed the private agreement in that case as evidencing how parties can contract regarding their own rights. The case did not speak to whether a state could use its power to create entities to regulate a domain governed by federal law.

As Professor Manesh has noted, the Delaware Supreme Court's embrace of contractarianism in *Salzberg* has broad implications. *See* Manesh, *supra*, at 547–75. For purposes of the Covenant, I do not perceive any conflict between what MCT calls for and what contractarianism would envision. The Covenant appears in a bargained-for agreement between contracting parties and is thus comparable to *Rodriguez*. The agreement addresses a stockholder right appurtenant to the shares that the Funds owned as their private property. The limitations on state power implied by MCT do not restrict the ability of stockholders to make contractual commitments regarding property rights that they could otherwise freely exercise.

81

greater constraints on their rights in a stockholders agreement than a corporation can impose in its charter or bylaws. As long as the contractual provision addresses a type of action that one stockholder or a group of stockholders can take, then there is greater space for private ordering, not less, when the provision appears in a stockholders agreement. The Covenant appears in a stockholder-level agreement, providing further support for the conclusion that it is not facially invalid.

"A share of stock represents a bundle of rights defined by the laws of the chartering state and the corporation's certificate of incorporation and bylaws."[160] By statute, a share of stock is the personal property of its owner.[161] The rights associated with and appurtenant to a share of stock are therefore rights that the owner can freely exercise or decline to exercise. Three rights are viewed as fundamental: the rights to sell, vote, and sue.[162]

Delaware law permits stockholders to contract over their right to sell:

> A restriction on the transfer or registration of transfer of securities of a corporation, or on the amount of a corporation's securities that may be owned by any person or group of persons, may be imposed . . . by an agreement among any number of security holders or among such holders and the corporation.[163]

---

[160] *Bamford*, 2020 WL 967942, at *23.

[161] 8 *Del. C.* § 159.

[162] *See Williams Cos. S'holder Litig.*, 2021 WL 754593, at *20 (Del. Ch. Feb. 26, 2021).

[163] 8 *Del. C.* § 202(b).

Delaware law specifically permits stockholders to (i) grant a right of first refusal on shares in favor the corporation or any person,[164] (ii) grant a right to purchase or sell the shares to the corporation or any person,[165] (iii) agree to obtain the consent of the corporation or the holders of any class or series of securities before selling shares,[166] (iv) commit to sell or transfer the shares to the corporation or any person,[167] and (v) restrict or prohibit the transfer of shares to designated persons, as long as the designation is not manifestly unreasonable.[168] Delaware law expansively permits "any other lawful restriction on transfer or registration of the restricted securities, or on the ownership of the restricted securities by any person."[169] The DGCL thus authorizes a stockholder to covenant not to sell.

Delaware law also permits stockholders to contract over their right to vote:

An agreement between 2 or more stockholders, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the shares held by them shall be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them.[170]

---

[164] *Id.* § 202(c)(1).

[165] *Id.* § 202(c)(2).

[166] *Id.* § 202(c)(3).

[167] *Id.* § 202(c)(4).

[168] *Id.* § 202(c)(5).

[169] *Id.* § 202(e).

[170] *Id.* § 218(c).

The DGCL thus authorizes a stockholder to covenant not to vote.

The DGCL confirms that a stockholder has greater freedom to restrict its rights to vote or sue in a private agreement than a corporation can impose through its charter or bylaws. For the right to sell, Section 202(b) provides that a restriction on the transfer, registration, or ownership of shares can be imposed through the charter, the bylaws, or by private agreement.[171] But if a restriction is imposed through the charter or bylaws, the restriction is *not binding* "with respect to securities issued prior to the adoption of the restriction unless the holders of the securities are parties to an agreement or voted in favor of the restriction."[172] Actual consent is required.

A similar structure exists for the right to vote. The DGCL requires that any "qualifications, limitations or restrictions" on the powers associated with a share of stock appear in the charter.[173] The power to vote is a power associated with a share of stock.[174] Through the charter, a corporation can create shares with or without voting rights or with tailored voting rights.[175] What the corporation cannot do through its charter is dictate how

---

[171] *Id.* § 202(b).

[172] *Id.*

[173] *Id.* §§ 102(a)(4), 151.

[174] *Id.* §§ 102(a)(4), 218(a).

[175] *Id.* § 151(a).

individual stockholders exercise their voting rights Yet through a voting agreement, stockholders can bind themselves to vote or not vote to any degree imaginable.[176]

The different levels of permissible constraints comport with the doctrine of independent legal significance.

> [T]he general theory of the Delaware Corporation Law is that action taken under one section of that law is legally independent, and its validity is not dependent upon, nor to be tested by the requirements of other unrelated sections under which the same final result might be attained by different means.[177]

To state the obvious, a stockholders agreement is not a charter or bylaw provision, so restrictions on charter or bylaw provisions do not govern stockholders agreements.

The different levels of permissible constraint reflect different levels of consent.[178]

- A provision in a pre-IPO charter does not receive express approval from the publicly held shares. Holders of shares become bound when they buy shares, making their consent implicit. The same is true in a private company for the original charter.[179]

- Under the DGCL, a midstream charter amendment requires both approval from the board and approval by the holders of a majority of the outstanding voting power of the corporation.[180] The adoption of a midstream charter amendment means that holders of a majority of the outstanding voting power have consented to it, which

---

[176] *Id.* § 218(c).

[177] *Orzeck v. Englehart*, 195 A.2d 375, 378 (Del. 1963).

[178] Verity Winship, *Shareholder Litigation by Contract*, 96 B.U. L. Rev. 485, 495–96 (2016) (noting that "[h]ow closely . . . corporate organizational documents approach robust ideas of consent depends on the type of document and when a particular provision is adopted" (footnote omitted)).

[179] *See* Helen Hershkoff & Marcel Kahan, *Forum-Selection Provisions in Corporate "Contracts"*, 93 Wash. L. Rev. 265, 269 (2018) (describing this form of implied consent).

[180] 8 *Del. C.* § 242(b).

indicates some level of consent.[181] But "any shareholder who did not vote in favor of the midstream amendment did not consent at all. . . . At most, such a shareholder consented to the *rules* for changing [the] charter . . . (to the extent these rules were established when the company initially sold the shares)."[182] A midstream charter amendment binds stockholders regardless of actual consent.

- Under the DGCL, a bylaw amendment provides ambiguous indications of consent. The board and the stockholders can typically each adopt, amend, alter, or repeal bylaws unilaterally.[183] If a board implements a bylaw, then stockholders are bound without any affirmative act of consent, other than having accepted the rules for amendment.[184] But because stockholders can amend the provision without board approval, the continued presence of the bylaw provides some indication of stockholder consent.[185]

None of these forms of consent resembles what contract law traditionally contemplates.[186]

By contrast, when stockholders execute a stockholder-level agreement, they provide the

---

[181] *See* Randall S. Thomas, *What Should We Do About Multijurisdictional Litigation in M&A Deals?*, 66 Vand. L. Rev. 1925, 1953–54 (2013) (describing this form of consent).

[182] Hershkoff & Kahan, *supra*, at 282.

[183] *See* 8 *Del. C.* § 109(a).

[184] Browning Jeffries, *The Plaintiffs' Lawyer's Transaction Tax: The New Cost of Doing Business in Public Company Deals*, 11 Berkeley Bus. L.J. 55, 95–98 (2014) (noting that although "corporate bylaws and charters have frequently been analogized to contracts[,] . . . the analogy to a contractual relationship weakens" in light of the fact that "the bylaws can be adopted or amended unilaterally by the board without shareholder consent").

[185] Hershkoff & Kahan, *supra*, at 283–85.

[186] *See* Ann M. Lipton, *Manufactured Consent: The Problem of Arbitration Clauses in Corporate Charters and Bylaws*, 104 Geo. L.J. 583, 608 (2016) ("The legal framework for the corporation therefore does not resemble anything like the legal framework for contracting parties."); Fisch, *supra*, at 381, 409 (describing the contractarian approach to charters and bylaws as "a powerful endorsement of contractual freedom in corporate law" while questioning whether Delaware decisions "may stretch the contract analogy too far").

level of consent that contract law traditionally contemplates, which in turn supports greater freedom to allocate rights.

At this point in the analysis, confusion can arise because of the hierarchy of authorities that govern a corporation. As I have written elsewhere,

> When evaluating corporate action for legal compliance, a court examines whether the action contravenes the hierarchical components of the entity-specific corporate contract, comprising (i) the Delaware General Corporation Law, (ii) the corporation's charter, (iii) its bylaws, and (iv) other entity-specific contractual agreements, such as a stock option plan, other equity compensation plan, or, as to the parties to it, a stockholder agreement.[187]

"Each of the lower components of the contractual hierarchy must conform to the higher components."[188]

When does a provision in a stockholders agreement conflict with the DGCL, the charter, or the bylaws such that the higher-level component overrides it? The DGCL, charter, and bylaws establish the rights that stockholders possess. If the stockholder-level agreement binds the stockholders as to how they exercise those rights, then there is no conflict. But if a stockholders agreement purports to alter or ignore the structure that the higher-level components created, then the effort is ineffective, and the higher-level component prevails.[189]

---

[187] *Quadrant Structured Prods. Co. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014).

[188] *Sinchareonkul*, 2015 WL 292314, at *6.

[189] *See Abercrombie v. Davies*, 123 A.2d 893, 898–99 (Del. Ch. 1956) (Seitz, C.) (holding that provision in stockholders agreement that purported to bind director to vote in

Take a provision in a stockholders agreement that attempts to define the number of directors comprising the whole board. Section 141(b) provides that the bylaws must identify the number of directors comprising the whole board, or the charter must specify a procedure for making that determination.[190] Stockholders therefore cannot contract to have a greater number of directors than the charter or bylaws specify. Stockholders can, however, contract about how to exercise their voting power to elect directors, and they could agree to maintain a *lesser* number of directors in office by making commitments about how to vote. That agreement would bind the stockholders as to the exercise of their rights *qua* stockholders, and it would not conflict with the charter or bylaws.

*Schroeder v. Buhannic*[191] provides a more complex illustration. The stockholders committed in a voting agreement to elect the following directors: (i) three designated by the holders of a majority of the common stock, one of whom shall be the CEO, (ii) two designated by the holders of a majority of the preferred stock, and (iii) two independent, non-employee directors selected by the holders of a majority of the common stock and approved by the holders of a majority of the preferred stock. The stockholders disagreed over whether the common stockholders could select the CEO, at which point the signatory stockholders had to vote for him as one of the three directors designated by the common

the same manner as a stockholder agent conflicted with Section 141(a) and was ineffective)*, rev'd on other grounds*, 130 A.2d 338 (Del. 1957).

[190] 8 *Del. C.* § 141(b).

[191] 2018 WL 11264517 (Del. Ch. Jan. 10, 2018) (ORDER).

stock, or whether the board selected the CEO, at which point the common stockholders had to designate him as one of their directors.[192] Appointing a CEO is a core board function, and the bylaws provided that the board selected the CEO, so the voting agreement could not override that allocation of authority. It followed that the board had the power to identify the CEO, the common stockholders bound themselves to name him as one of their three designees, and all of the signatory stockholders bound themselves to vote for him.[193]

These principles point to a simple test for determining whether a provision in a stockholders agreement conflicts with the DGCL, charter, and bylaws: Does the contractual provision address an action that a stockholder individually or a group of stockholders collectively could take? If yes, then a stockholder can contract over that action in advance, without violating the corporate hierarchy. The DGCL, charter, and bylaws specify what rights are appurtenant to the shares and available for the stockholders to exercise. The stockholder gets to choose whether to exercise those rights and can agree contractually to constrain its exercise of those rights.

By analogy to the right to vote and the right to sell, limitations on the right to sue that appear in the charter or bylaws should be more suspect than limitations in a stockholders agreement. Once the DGCL, charter, and bylaws have established the rights appurtenant to the shares, including the rights that a stockholder can sue to enforce, the

---

[192] *Id.*

[193] *Id.* at *3.

stockholder should have relatively unconstrained freedom to contract about asserting those rights. Just as a stockholder can covenant not sell or vote, a stockholder should be able to covenant to not sue. This reasoning suggests that the Covenant is not facially invalid.

## E.    Other Considerations

The preceding tour through traditional fiduciary law, the DGCL, Delaware corporate law, and Delaware's support for private ordering indicates that the Covenant is not facially invalid. But to hold that stockholders in a Delaware corporation can commit not to sue for breach of fiduciary duty is a significant step, so it is worth considering other possible arguments against it. This section considers (i) whether the right to sue for breach of fiduciary duty is too big to waive, (ii) whether enforcing a provision like the Covenant threatens Delaware's corporate brand, (iii) whether upholding a provision like the Covenant collapses the distinction between corporations and LLCs, and (iv) the majority and dissenting opinions in *Manti*. Those considerations do not support declaring the Covenant facially invalid.

### 1.    Is A Claim For Breach Of Fiduciary Duty Too Big To Waive?

An intuitively attractive argument for declaring the Covenant facially invalid is that a claim for breach of fiduciary duty is simply too important to waive. One way to evaluate that contention is to consider what other rights are waivable.[194]

---

[194] *See Manti*, 261 A.3d at 1219 (comparing waiver of appraisal rights to waiver of jury trial when considering whether public policy bars the former).

Delaware law permit individuals to waive fundamental rights associated with their personal liberty:

- Both the United States Constitution and the Delaware Constitution guarantee a criminal defendant the right to trial by jury.[195] That right can be waived.[196]

- Both the United States Constitution and the Delaware Constitution provide a criminal defendant with a right to be present for trial and confront the witnesses against him.[197] That right can be waived.[198]

- Both the United States Constitution and the Delaware Constitution provide a witness with a right to counsel in a criminal case.[199] That right can be waived.[200]

---

[195] U.S. Const. art. III, § 2 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ."); U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed . . . ."); Del. Const. art. I, § 7 ("In all criminal prosecutions, the accused hath a right . . . to . . . a speedy and public trial by an impartial jury. . . .").

[196] *Davis v. State*, 809 A.2d 565, 568 (Del. 2002).

[197] U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."); Del. Const. art. I, § 7 ("In all criminal prosecutions, the accused hath a right . . . to meet the witnesses in their examination face to face . . . .").

[198] *Illinois v. Allen*, 397 U.S. 337, 342–43 (1970); *Wells v. State*, 396 A.2d 161, 162–63 (Del. 1978).

[199] U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."); Del. Const. art. I, § 7 ("In all criminal prosecutions, the accused hath a right to be heard by himself or herself and his or her counsel.").

[200] *Faretta v. California*, 422 U.S. 806, 835 (1975); *Briscoe v. State*, 606 A.2d 103, 107 (Del. 1992).

- Both the United States Constitution and the Delaware Constitution protect against self-incrimination.[201] That right can be waived.[202]

- A criminal defendant can waive all of his rights to personal liberty by entering a guilty plea, freely and voluntarily.[203]

As the Delaware Supreme Court has observed, "Clearly, our legal system permits one to waive even a constitutional right."[204]

Delaware law permits individuals to waive important rights associated with their property. A waiver of a property right is generally effective so long as it is voluntary, knowing, and intelligently made, or reflects an intentional relinquishment or abandonment or of a known right or privilege.[205] For example, under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, a civil debtor has a constitutional right to notice and a hearing before judgment is entered. Delaware law permits a debtor to waive that right by agreeing to a confession of judgment clause.[206] In a civil case, a plaintiff

---

[201] U.S. Const. Amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."); Del. Const. art. I, § 7 ("In all criminal prosecutions, the accused hath a right to be heard by himself or herself and his or her counsel [and] he or she shall not be compelled to give evidence against himself or herself.").

[202] *Rogers v. United States*, 340 U.S. 367, 371 (1951); *Ratsep v. Mrs. Smith's Pie Co.*, 221 A.2d 598, 599 (Del. Super. Ct. 1966).

[203] *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *Sheppard v. State*, 367 A.2d 992, 994 (Del. 1976).

[204] *Baio v. Com. Union Ins. Co.*, 410 A.2d 502, 508 (Del. 1979).

[205] *D.H. Overmeyer Co. Inc. v. Frick Co.*, 405 U.S. 174, 186 (1972); *Mazik v. Decision Making, Inc.*, 449 A.2d 202, 204 (Del. 1982).

[206] *See Overmeyer*, 405 U.S. at 185; *Mazik*, 449 A.2d at 204.

can waive the right to a jury trial by agreeing to arbitrate[207] or simply by failing to request a jury trial.[208]

Delaware law generally permits individuals to waive statutory rights.[209] Real property owners can agree to deed restrictions that waive their ability to use their property in specified ways.[210] Individuals can agree to covenants that restrict their ability to work for a competitor.[211] Individuals can enter into non-disclosure agreements that limit their ability to speak.[212]

---

[207] *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989).

[208] *Brown v. State*, 721 A.2d 1263, 1266 (Del. 1998).

[209] *See, e.g.*, *Tang Cap. P'rs, LP v. Norton*, 2012 WL 3072347, at *7 (Del. Ch. July 27, 2012) (holding that the plaintiff contractually waived its rights to seek a receivership under Section 291 of the DGCL); *Libeau*, 880 A.2d at 1056 (holding that the plaintiff waived her right to statutory partition by contract, noting that "[b]ecause it is a statutory default provision, it is unsurprising that the absolute right to partition might be relinquished by contract, just as the right to invoke § 273 to end a joint venture or to seek liquidation may be waived in the corporate context"); *Red Clay Educ. Ass'n v. Bd. of Educ. of Red Clay Consol. Sch. Dist.*, 1992 WL 14965, at *6 (Del. Ch. Jan. 16, 1992) (holding that a provision in a collective bargaining agreement constituted an effective waiver of negotiation right under unfair labor practices statute).

[210] *See Indus. Rentals, Inc. v. New Castle Cnty. Bd. Of Adjustment*, 776 A.2d 528, 529–30 (Del. 2001); *Save Our Cnty., Inc. v. New Castle Cnty.*, 2013 WL 2664187, at *2 (Del. Ch. June 11, 2013).

[211] *Rsch. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *6–7 (Del. Ch. Nov. 18, 1992) (Allen, C.).

[212] *SphereCommerce, LLC v. Caulfield*, 2022 WL 325952, at *1 (Del. Ch. Feb. 2, 2022).

It is not self-evident why Delaware law would afford greater protection to a property interest associated with a share of stock that enables the owner to sue for breach of fiduciary duty than it does for those fundamental liberty and property interests. A comparison to what else individuals can waive suggests that the Covenant is not facially invalid.

## 2. The Threat To Delaware's Corporate Brand

A rhetorically powerful argument for declaring the Covenant facially invalid asserts that it would undermine Delaware's corporate brand. In a well-known article, two practitioners argue that Delaware offers a corporate product that comes with commonly understood attributes, including mandatory and generally immutable fiduciary duties.[213] Although the authors did not address stockholder-level agreements, the branding argument posits that to permit a stockholder to waive a mandatory feature of Delaware law would undermine the common understanding of a Delaware corporation. Therefore, the argument goes, a provision like the Covenant should be invalid. While maintaining the value of Delaware's corporate brand is important, it does not call for invalidating a private agreement in which stockholders make commitments about how to exercise their stockholder-level rights.

The argument about Delaware's corporate brand stresses the benefits of standardization.[214] There are benefits from standardized roles and relationships, because

---

[213] *See* Welch & Saunders, *supra*, at 846–47.

[214] *Id.* at 865–66.

94

standardization reduces transaction costs, creates shared understandings, influences conduct, and enables the law to promote values beyond efficiency.[215]

Delaware's embrace of private ordering already goes a long way towards limiting the benefits of standardization for Delaware corporations. A prudent investor must review the charter and bylaws to understand the rights appurtenant to the corporation's shares and any limitations that exist on the exercise of those rights. . Even if a corporation has not itself engaged in private ordering, the potential for private ordering requires investigation. An investor cannot assume that one Delaware corporation is just like the others.

The practitioners who emphasize brand value argue that mandatory terms are nevertheless essential to Delaware's corporate brand:

> Merely by branding itself as a Delaware corporation, a firm can signal easily that it has certain core characteristics that provide basic protections to investors. Anyone contemplating buying shares of stock in a Delaware corporation can be confident, without having to obtain and examine the certificate of incorporation, that the directors of the corporation will be subject to a duty of loyalty; that stockholders will have the right to inspect corporate books and records for a proper purpose; and that the stockholders will have the right, periodically, to elect the directors. [216]

---

[215] *See* Harding, *supra*, at 88 ("[T]he mediating function of social roles depends on stability in the normative constitution of these roles; where this is lost, roles may lose their traction as normative resources and people may stop organizing their affairs with reference to them. Where fiduciary law too readily permits opt outs, there is a risk that fiduciary roles might cease to be comprehensible to those whose actions engage with them, and this might generate costs.").

[216] Welch & Saunders, *supra*, at 866 (emphasis added).

True, an investor need not review the certificate or bylaws to confirm those three features, but an investor needs to examine the charter and bylaws to assess all of the other features that can change. Tellingly, the authors spend much of their article discussing the considerable space for private ordering that the DGCL provides.[217]

When turning to the rare mandatory features in the DGCL, the authors focus exclusively on what corporate planners cannot modify in the charter or bylaws.[218] They do not make claims about what stockholders can agree to in stockholder-level agreements. That editorial decision is understandable, because stockholder-level agreements do not alter the rights that the DGCL, charter, and bylaws bestow. Through a stockholder-level agreement, stockholders can make commitments about how they exercise their rights, but they cannot change those rights. A stockholder-level agreement only binds its signatories, and other stockholders remain free to exercise their rights differently. Even if some of the stockholders have entered into agreements among themselves, it remains true that "[a]nyone contemplating buying shares of stock in a Delaware corporation can be confident, without having to obtain and examine the certificate of incorporation, that the directors of the corporation will be subject to a duty of loyalty; that stockholders will have

---

[217] *Id.* at 847-855. When the authors reach the topic of mandatory provisions, they caution that even those are subject to change, and "[i]t may be that the mandatory rules that exist today will be loosened tomorrow." *Id.* at 855.

[218] *Id.* at 855-60.

the right to inspect corporate books and records for a proper purpose; and that the stockholders will have the right, periodically, to elect the directors."[219]

That said, some stockholder-level agreements are sufficiently weighty that they can affect the shared expectations created by the corporation's constitutive documents. When a critical mass of stockholders have bound themselves to exercise their stockholder-level rights in a particular way, then their agreement can exert a gravitational pull that distorts the corporate governance space. Most stockholder-level agreements do not have that effect. A proxy is a stockholder-level agreement, and the vast majority of proxies are routine. A call or put option is a stockholder-level agreement, and those are mostly routine as well. The agreement that creates a control group obviously does have a field-distorting effect, and even generally inconsequential agreements like proxies and options can become consequential, such as an irrevocable proxy to vote a control block or a call right on a majority of the shares.[220]

Investors should know about consequential stockholder-level agreements.[221] The logical answer to non-disclosure is not to invalidate the agreements, but to require

---

[219] Welch & Saunders, *supra*, at 866.

[220] *E.g.*, *Daniel v. Hawkins*, 289 A.3d 631 (Del. 2023) (analyzing purportedly irrevocable proxy conferring corporate control); *Hokanson v. Petty*, 2008 WL 5169633 (Del. Ch. Dec. 10, 2008) (enforcing option to acquire a majority of the shares of the corporation and dictate the form of the transaction).

[221] *See generally* Jill E. Fisch, *Stealth Governance: Shareholder Agreements and Private Ordering*, 99 Wash. U.L. Rev. 913, 947-53 (2021); Gabriel Rauterberg, *The*

disclosure. The DGCL could state that a stockholder agreement meeting certain criteria is only enforceable if a copy is provided to the corporation, which then must either (i) file the agreement or a summary with the Delaware Secretary of State or (ii) note its existence on the stock ledger and make it available for inspection upon request. The DGCL already takes the former course for merger agreements[222] and the latter for voting trust agreements.[223] It would be important to craft the criteria with care, because so many stockholder-level contracts do not warrant that treatment.

For purposes of a Delaware corporation, a stockholder-level agreement that allocates how stockholders exercise their rights is on-brand, not off. Private ordering and fiduciary accountability are key components of Delaware's corporate brand. A stockholder-level agreement is a quintessential form private ordering, because it involves stockholders making commitments about their own rights. Other stockholders remain free to exercise their rights as they wish, including by exercising their rights to pursue corporate accountability.

This case involves two key elements of Delaware's corporate brand, so an appeal to brand value is unlikely to be dispositive. An advocate could assemble citations suggesting that one policy or the other is more important, but the result would reveal more about the

_____

*Separation of Voting and Control: The Role of Contract in Corporate Governance*, 38 Yale J. Reg. 1124, 1144–48 (2021).

[222] *See* 8 *Del. C.* § 251(c).

[223] *See id.* §§ 218(a)–(b).

research team's skill than the relative importance of the policies. Because brand value is elusive,[224] appeals to brand value could lead to broad normative claims, less emphasis on traditional authorities, and the possibility that personal preferences sneak into the analysis. Scholars may attempt to capture or characterize the value of Delaware's brand as a way of explaining Delaware's success.[225] Practitioners and Delaware's Division of Corporations may market Delaware as a brand.[226] They are not deciding cases. To that end, when the authors who emphasize mandatory features as important to Delaware's corporate brand

---

[224] *See* Omari Scott Simmons, *Branding the Small Wonder: Delaware's Dominance and the Market for Corporate Law*, 42 U. Rich. L. Rev. 1129, 1144–45 (2008) ("Despite its undeniable importance, branding, at times, seems like an amorphous concept without a precise definition. . . . In a broad sense, branding describes a range of elements that form a complete service or product experience. The branding concept has traditionally focused on points of differentiation, i.e., unique benefits, which set a product or service apart from the competition." (internal footnotes omitted)); Kevin Lane Keller, *The Brand Report Card*, Harv. Bus. Rev. (Jan.–Feb. 2000), https://hbr.org/2000/01/the-brand-report-card ("Why do customers really buy a product? Not because the product is a collection of attributes but because those attributes, together with the brand's image, the service, and many other tangible and intangible factors, create an attractive whole. In some cases, the whole isn't even something that customers know or can say they want. . . . In strong brands, brand equity is tied both to the actual quality of the product or service and to various intangible factors.").

[225] William J. Moon, *Delaware's Global Competitiveness*, 106 Iowa L. Rev. 1683, 1692–700, 1734 & n.250 (2021) (discussing characteristics of the Delaware "brand"); Simmons, *supra*, at 1146 ("Delaware's brand equity is tied both to tangible aspects of its service and to various intangible factors."); Peter Molk, *Delaware's Dominance and the Future of Organizational Law*, 55 Ga. L. Rev. 1111, 1122–30 (2021) (discussing the role Delaware's brand plays in its "dominance" over United States corporate law).

[226] *Why Businesses Choose Delaware*, Del. Div. Corp., https://corplaw.delaware.gov/why-businesses-choose-delaware/ (last visited Apr. 29, 2023).

assess which features are mandatory, they rely on traditional legal authorities.[227] Even for them, brand value is not an input, but an output. It is not a means of determining which aspects of Delaware's corporate regime cannot be tailored; it is the result of making that determination by other means.

There may be cases where considering brand value might be helpful. Particularly when aspects of brand value are easily identified and all point in the same direction, then referring to brand value could provide support for an outcome. In this case, two core components point in opposite directions, making brand value too uncertain to use as a tiebreaker. The argument about Delaware's corporate brand does not warrant holding the Covenant facially invalid.

### 3. Corporate Law As LLC Law

Another rhetorically powerful argument for declaring the Covenant facially invalid asserts that to permit stockholders to waive claims for breach of fiduciary through a private agreement would blur the distinction between corporations and LLCs. There is value in distinguishing between the two types of entities, but stockholder-level contracting about stockholder-level rights does not collapse the divide.

For starters, the line between corporate law and LLC law is already blurred, albeit from the other side. Decisions frequently observe that LLCs "are creatures of contract,"[228]

---

[227] *Id.* at 856-60.

[228] *TravelCenters of Am., LLC v. Brog*, 2008 WL 1746987, at *1 (Del. Ch. Apr. 3, 2008); *accord, e.g.*, *Henson v. Sousa*, 2015 WL 4640415, at *1 (Del. Ch. Aug. 4, 2015)

which they primarily are.[229] The Delaware Limited Liability Company Act (the "LLC Act") provides that "[i]t is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[230] Because of this freedom, "[v]irtually any management structure may be implemented through the company's governing instrument."[231] Using the contractual freedom that the LLC Act confers, the drafters of an LLC agreement can create a manager-managed entity, label the managers a "board of directors," refer to the LLC interests as

---

("LLCs, as this Court has repeatedly pointed out, are creatures of contract."); *Touch of It. Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *4 (Del. Ch. Jan. 13, 2014) ("[R]ecognizing that LLCs are creatures of contract, I must enforce LLC agreements as written."); *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Limited liability companies are creatures of contract . . . ."); *see Fisk Ventures LLC v. Segal*, 2008 WL 1961156, at *8 (Del. Ch. May 7, 2008) ("In the context of limited liability companies, which are creatures . . . of contract, those duties or obligations [among parties] must be found in the LLC Agreement or some other contract." (footnote omitted)).

[229] *See In re Seneca Invs. LLC*, 970 A.2d 259, 261 (Del. Ch. 2008) ("An LLC is primarily a creature of contract. . . ."). The adverb "primarily" recognizes the critical non-contractual dimensions of the entity that this decision has discussed in connection with MCT, such as "separate legal existence, potentially perpetual life, and limited liability for its members." *In re Carlisle Etcetera LLC*, 114 A.3d 592, 605–06 (Del. Ch. 2015). *See generally* Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup to Contract As Deity*, 14 Fordham J. Corp. & Fin. L. 445, 460–71 (2009) (identifying historical, jurisprudential, and policy reasons why LLCs should not be regarded as purely contractual entities).

[230] 6 *Del. C.* § 18-1101(b).

[231] Robert L. Symonds, Jr. & Matthew J. O'Toole, *Delaware Limited Liability Companies* § 9.01[B], at 9-9 (2d ed. 2019).

"shares," and provide that the LLC will be governed by the DGCL and operate as if it were a Delaware corporation.[232]

Returning to the corporate side of the divide, a stockholder-level agreement does not risk blurring the distinctions between the entities, because those distinctions exist at the level of the governing statutes and the constitutive documents.[233] Regardless of what investors might agree to in investor-level agreements, there are fundamental differences between what a certificate of formation must contain (virtually nothing) and what a certificate of incorporation must contain (six enumerated items including the number and types of shares the corporation can issue and any special rights, powers, privileges,

---

[232] *See id.* ("A limited liability company may be structured on the basis of a corporate model . . . ."); *see, e.g.*, *Fla. R & D Fund Invs., LLC v. Fla. BOCA/Deerfield R & D Invs., LLC*, 2013 WL 4734834, at *2, *7 (Del. Ch. Aug. 30, 2013) (addressing LLC agreement that created a board of directors to manage the entity); *Kahn v. Portnoy*, 2008 WL 5197164, at *4 (Del. Ch. Dec. 11, 2008) (interpreting LLC agreement which created board of directors to manage the entity and which provided that the "'authority, powers, functions and duties (including fiduciary duties)' of the board of directors will be identical to those of a board of directors of a business corporation organized under the Delaware General Corporation Law . . . unless otherwise specifically provided for in the LLC Agreement"); *Seneca Invs.*, 970 A.2d at 261 (interpreting LLC agreement which provided that, subject to certain exceptions, "the Company will be governed in all respects as if it were a corporation organized under and governed by the Delaware General Corporation Law . . . and the rights of its Stockholders will be governed by the DGCL"); *see also Matthew v. Laudamiel*, 2012 WL 2580572, at *1 (Del. Ch. June 29, 2012) (interpreting LLC agreement that created board of managers to oversee business and affairs of entity); *VGS, Inc. v. Castiel*, 2003 WL 723285, at *2 (Del. Ch. Feb. 28, 2003) (same).

[233] *See* Welch & Saunders*, supra*, at 864-65 (contrasting what the DGCL permits the charter or bylaws of a corporation to contain with what the LLC Act permits an LLC agreement to contain; not engaging with what investors can agree to in investor-level agreements).

qualifications, and limitations on those shares).[234] And there are fundamental differences between what an LLC can achieve through its constitutive document (minimally constrained) and what a corporation can achieve (moderately constrained). Most notably, the constitutive document of an LLC (the LLC agreement) can (i) fully eliminate any duties existing at law or in equity, including fiduciary duties,[235] (ii) provide indemnification and

---

[234] *Compare* 6 *Del. C.* § 18-201(a) *with* 8 *Del. C.* § 102(a).

[235] *See* 6 *Del. C.* § 18-1101(c) ("To the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing."). When the General Assembly adopted Section 18-1101(e), Delaware decisions had not yet distinguished cleanly between the concept of good faith in fiduciary law and the role that the implied covenant of good faith and fair dealing plays as a source of implied contractual terms. *See, e.g.*, *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 418–19 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013); *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *7 n.74 (Del. Ch. Jan. 29, 2015). The statement that an LLC agreement "may not eliminate the implied contractual covenant of good faith and fair dealing" seems like an attempt to preserve some form of obligation to act in good faith. But in its role as a source of implied terms, the implied covenant cannot fulfill that mission, because the implied covenant does not operate as a fiduciary substitute. *Wood v. Baum*, 953 A.2d 136, 143 (Del. 2008) ("The implied covenant of good faith and fair dealing is a creature of contract, distinct from the fiduciary duties that the plaintiff asserts here."). And express terms displace it, enabling alternative entity agreements to authorize a decision maker to consider and act based on its own interests, irrespective of the entity's interests. *See, e.g.*, *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 361 (Del. 2013) (enforcing provision that allowed a general partner to "consider only such interests and factors as it desires"); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 181 (Del. Ch. 2014) (upholding provision that "confers contractual discretion on the Conflicts Committee to balance the competing interests of the Partnership's various entity constituencies when determining whether a conflict-of-interest transaction is in the best interests of the Partnership"), *aff'd*, 2015 WL 803053 (Del. Feb.

103

advancement unconstrained by any statutory standards,[236] and (iii) fully eliminate any and

all liabilities, except for *bad faith* breaches of the implied covenant of good faith and fair

dealing.[237] By contrast, the constitutive document of a corporation (the charter and bylaws)

---

26, 2015) (TABLE); Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law*, 60 Bus. Law. 1469, 1484 (2005) (recommending that alternative entity agreements provide that the decision maker be granted discretion to "consider only such interests and factors as it desires, including its own interests," and eliminate any "duty or obligation to give any consideration to any interest of or factors affecting the" entity or its investors). Nor does the statutory mandate to preserve the implied covenant provide incremental protection, because the implied covenant of good faith and fair dealing already inheres in every contract governed by Delaware law and cannot be eliminated. *See Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442–43 (Del. 2005).

[236] *See* 6 *Del. C.* § 18-108 ("Subject to such standards and restrictions, if any, as are set forth in its limited liability company agreement, a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demands whatsoever.").

[237] *See id.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."). Like the statutory preservation of the implied covenant of good faith and fair dealing in Section 18-1101(c), the statutory preservation of liability for bad faith violations of the implied covenant was likely an attempt to retain accountability for intentional misconduct that ran contrary to the best interests of the entity. But here again, the implied covenant cannot fulfill its mission, because it is not a fiduciary substitute. *See Wood*, 953 A.2d at 143. It is also wickedly difficult under Delaware law to prove a claim for breach of the implied covenant, and all the more so to prove a *bad faith* breach of an *implied* term. "Rather than preserving a measure of accountability by imposing a meaningful floor, the statutory limit on exculpation sets the bar at the band sill." *Bamford v. Penfold, L.P.*, 2022 WL 2278867, at *33 n.18 (Del. Ch. June 24, 2022).

(i) can shape fiduciary duties but cannot eliminate them,[238] (ii) cannot eliminate monetary liability for breach of fiduciary duty except for breaches of the duty of care,[239] (iii) cannot provide indemnification or advancement that goes beyond statutory standards,[240] and (iv) cannot constrain liability for breach of the implied covenant of good faith and fair dealing.[241]

Those profound differences make LLCs and corporations resolutely different things. Those differences remain even though each type of entity confers bundles of rights on investors that manifest as a form of personal property (a member interest or a share).[242] Those differences persist when the holders of those investor-level rights (i) decide in real time whether or not to exercise their rights and (ii) make contractual commitments about rights that they otherwise could exercise freely. True, there is a superficial similarity in the ability of both LLC members and stockholders to make exercise-or-refrain decisions and to enter into investor-level agreements about those decisions, but that resemblance does

---

[238] *See* Part II.D, *supra.*

[239] *See* 8 *Del. C.* § 102(b)(7).

[240] *See id.* § 145.

[241] *See, e.g.*, *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *17 (Del. Ch. Mar. 6, 2012) (explaining that implied covenant of good faith and fair dealing inhered in charter and bylaws); *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1032 (Del. Ch. 2004) (deploying implied covenant of good faith and fair dealing when interpreting certificate of incorporation), *aff'd*, 872 A.2d 559 (Del. 2005).

[242] *See* 6 *Del. C.* § 18-701; 8 *Del. C.* § 159.

not alter the basal gulf between the underlying forms of state-created property (the entities themselves).[243] The argument about collapsing the entity divide is not a basis to declare the Covenant facially invalid.

### 4.       The Opinions In *Manti*

The majority and dissenting opinions in *Manti* provide insight into how the Delaware Supreme Court viewed a similar public policy issue. In *Manti*, the justices considered whether to enforce a covenant not to assert appraisal rights, which the high court labeled the "Refrain Obligation." Like the Covenant, the Refrain Obligation appeared in a drag-along provision in a voting agreement. As in this case, investment funds who had entered into the voting agreement sought to escape their promise by arguing that the Refrain Obligation was invalid.

The majority opinion in *Manti* upheld the Refrain Obligation, but it contains language which could be read to suggest that the Covenant is facially invalid. The dissent would have invalidated the Refrain Obligation, suggesting a similar outcome for the

---

[243] To take a simplistic example, I may own a bicycle and a motorcycle, which are different types of vehicles. Regardless of which I ride on a particular day, I can select my destination, pick a route, choose to stop for coffee, and decide where to park. My ability to make similar choices does not collapse the distinction between the two forms of transportation. Nor would the distinction collapse if I made similar promises about how I would use or not use the forms of transportation, or even if I promised to not use one form of transportation in a manner prohibited for the other form of transportation. I could promise my spouse that I would not ride my bicycle on a path closed to motorized vehicles, and by making that promise, I have agreed not to use my bicycle in a manner prohibited for motorcycles. That does not make my bicycle a motorcycle. Nor does a stockholder's promise to not assert a claim for breach of fiduciary duty that a member of an LLC might not be able to assert turn the corporation into an LLC.

106

Covenant. Spurred by the opinions in *Manti*, this decision has sought to engage deeply with traditional fiduciary principles, the DGCL, Delaware common law, and private ordering. This decision concludes that under *Manti*, a narrow provision like the Covenant in not facially invalid, but a court must scrutinize the facts and circumstances carefully to determine whether the provision is valid as applied. The *Manti* decision points to a range of factors that a court can consider. At bottom, the proponent of the provision must show that it is reasonable.

### a. The *Manti* Majority

The investment funds in *Manti* advanced two grounds for invalidating the Refrain Obligation. First, they claimed that the provision violated Section 262, which governs appraisal rights. Second, they argued that the provision violated Delaware public policy. A majority of the Delaware Supreme Court rejected both arguments.

The argument for statutory invalidity relied on language in Section 262 stating that "[a]ppraisal rights shall be available for the shares of any class or series of stock of a constituent or converting corporation in a merger or consolidation or conversion [subject to specified exceptions]."[244] The investment funds contended that the statute's use of the auxiliary verb "shall" meant that appraisal rights were mandatory and could not be waived through a voting agreement. The majority rejected that assertion, citing (i) Delaware's

---

[244] 8 *Del. C.* § 262(b).

public policy in favor of private ordering,[245] (ii) the absence of any express prohibition in the DGCL on the waiver of appraisal rights,[246] (iii) the general principal that parties can waive mandatory rights,[247] and (iv) the fact that the stockholders who signed the agreement were "sophisticated and informed investors, represented by counsel, that used their bargaining power to negotiate for funding . . . in exchange for waiving their appraisal rights."[248] Under the majority's reasoning, the DGCL created a stockholder-level right to seek appraisal, and a stockholder could decide whether or not to exercise that right. Just as a stockholder could make that decision in real time, a stockholder could commit in advance to refrain from exercising that right. The Refrain Obligation therefore did not conflict with the DGCL.

The public policy argument for invalidity asserted that appraisal rights were too important for stockholders to waive. The majority rejected that argument as well and deemed the Refrain Obligation enforceable. The reasons the majority offered can be sorted into two categories: responses to a facial challenge, and responses to an as-applied challenge. Under the first heading, the majority observed that (i) appraisal rights did not play "a sufficiently important role in regulating the balance of power between corporate

---

[245] *Manti*, 261 A.3d at 1216, 1217–18.

[246] *Id.* at 1218–20.

[247] *Id.* at 1219.

[248] *Id.* at 1220.

constituencies to forbid sophisticated and informed stockholders from freely agreeing to an *ex ante* waiver,"[249] and (ii) the waiver of appraisal rights was a logical consequence of a drag-along provision, which generally required signatory stockholders to vote for the qualifying transaction and thereby indirectly waive their appraisal rights.[250] Under the second heading, the majority noted that (i) the Refrain Obligation was not imposed on stockholders unilaterally,[251] (ii) the signatory stockholders were not retail investors and there was no imbalance of information,[252] and (iii) the sophisticated investors who agreed to the Refrain Obligation could understand its implications and knowingly waive their rights.[253] In light of these points, the Refrain Obligation was not contrary to public policy.

At various points in the decision, the majority cited factual considerations that apply equally to the Funds, the defendants, and the Covenant:

- The Funds are "sophisticated investors, represented by counsel, that agreed to a clear waiver of their [right to challenge a Drag-Along Sale] in exchange for valuable consideration."[254]

- The Voting Agreement is "not a contract of adhesion."[255]

---

[249] *Id.* at 1224.

[250] *Id.* at 1225.

[251] *Id.*

[252] *Id.*

[253] *Id.* at 1226.

[254] *See id.* at 1221; *accord id.* at 1225.

[255] *See id.* at 1221.

- The Funds "have not argued that they were ignorant of the [Covenant] when they signed the contract or that the inclusion of the [Covenant] was a mistake."[256]

- It would have been "easy for the [Funds] to predict the circumstances in which the [Covenant] would be invoked, namely, [Rich] and the board might approve a [Drag-Along Sale]."[257]

- The Covenant is not being enforced "against a retail investor that was not involved in negotiating the [Voting] Agreement."[258]

- The Covenant is not being enforced "against outsiders that lack material knowledge of [the Company's] corporate governance dynamics."[259]

- The Funds were "insiders for the purpose of negotiating the [Voting] Agreement."[260]

- There is no suggestion that Rich "coerced the [Funds] into" agreeing to the Covenant.[261]

- There is no suggestion that the Funds "did not know that the [Voting] Agreement contained the [Covenant]."[262]

- There is no suggestion that Rich "had any secret knowledge when [he] negotiated the [Voting] Agreement."[263]

---

[256] *See id.*

[257] *See id.* at 1222.

[258] *See id.* at 1225.

[259] *See id.*

[260] *See id.*

[261] *See id.*

[262] *See id.*

[263] *See id.*

- The Funds are "capable investors" who "do not need protection of the courts to escape a bad bargain."[264]

- The Covenant does not raise "concerns about a lack of consent."[265]

- The Covenant does not involve "enforce[ing] a contract of adhesion against a stockholder that lacked bargaining power."[266]

- The Funds "specifically assented to the [Voting] Agreement."[267]

- The Funds were "represented by counsel and had negotiating leverage."[268]

- The Funds "freely and knowingly consented to the [Covenant] in exchange for valuable consideration."[269]

Through its analysis, the *Manti* majority built on *Salzberg*'s embrace of contractarian principles. But while upholding the Refrain Obligation, the majority cautioned that its decision did not mean that all appraisal waivers were valid:

> Allowing [the company] to enforce this Refrain Obligation against these Petitioners does not mean that all *ex ante* waivers of appraisal rights are enforceable or that the waiver of any other stockholder right would be enforceable. To the contrary, there are other contexts where an *ex ante* waiver of appraisal rights would be unenforceable for public policy reasons.[270]

---

[264] *See id.*

[265] *See id.*

[266] *See id.*

[267] *See id.*

[268] *See id.*

[269] *See id.*

[270] *Id.* at 1226.

The multi-factor analysis conducted by the *Manti* majority suggests that if some or all of those factors were absent, then a similar provision would be suspect.

The *Manti* majority also admonished corporate planners that all stockholder-level rights were not automatically fair game for contractual waivers:

> [T]here may be other stockholder rights that are so fundamental to the corporate form that they cannot be waived *ex ante*, such as certain rights designed to police corporate misconduct or to preserve the ability of stockholders to participate in corporate governance. Allowing [the company] to enforce the Refrain Obligation against the Petitioners does not mean that the *ex ante* waiver of all other stockholder rights would be enforceable.[271]

Fairly read, that warning seems to refer to the duty of loyalty, which is "fundamental to the corporate form" and the principal means by which Delaware courts "police corporate misconduct." The *Manti* majority did not specifically call out the duty of loyalty, but if not that duty, then what? Not the right to vote for directors or on fundamental transactions like mergers, because the DGCL permits stockholders to constrain their right to vote in a stockholder-level agreement.[272] Not the right to sell their shares, because the DGCL permits stockholders to constrain their right to sell in a stockholder-level agreement.[273] Perhaps the right to seek books and records,[274] but right is instrumental to the ability to exercise other rights, and if a stockholder-level agreement can constrain the ultimate rights,

---

[271] *Id.*

[272] *See* 8 *Del. C.* § 218(c).

[273] *See id.* § 202(c).

[274] *See id.* § 220.

112

it should be able to constrain the instrumental right. Two Court of Chancery decisions indicate that a stockholder can waive or limit its ability to exercise Section 220 rights through a clear and express provision in a bilateral agreement.[275]

Prompted by the majority's cautionary statements in *Manti*, this decision has explored whether all fiduciary waivers are facially invalid. As this decision has shown, traditional fiduciary principles, the DGCL, and Delaware common law permit significant degrees of fiduciary tailoring, most pertinently through provisions that specifically authorize a fiduciary to engage in a type of transaction that otherwise would constitute a breach. In light of that authority, this decision cannot conclude that all fiduciary waivers

---

[275] *See Schoon v. Troy Corp.*, 2006 WL 1851481, at *2 (Del. Ch. June 27, 2006); *Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 125 (Del. Ch. 2000). A charter-based waiver, however, would be invalid. *See State v. Penn-Beaver Oil Co.*, 143 A. 257, 260 (Del. 1926) ("[T]he provision in defendant's charter which permits the directors to deny any examination of the company's records by a stockholder is unauthorized and ineffective."); *Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *5 (Del. Ch. Apr. 28, 2004) ("Nor could they rely upon a certificate provision prohibiting disclosure to avoid a shareholder's inspection right conferred by statute."); *BBC Acq. Corp. v. Durr-Fillauer Med., Inc.*, 623 A.2d 85, 90 (Del. Ch. 1992) (holding that a contract with a third party could not be used to limit inspection rights, which "cannot be abridged or abrogated by an act of the corporation"); *Loew's Theaters, Inc. v. Com. Credit Co.*, 243 A.2d 78, 81 (Del. Ch. 1968) (holding that charter provision which limited inspection rights to holder of 25% of shares was void as conflicting with statute); *State v. Loft, Inc.*, 34 Del. 538, 156 A. 170, 173 (Del. Ch. 1931) (following *Penn-Beaver*). An article by leading practitioners that identifies Section 220 rights as "mandatory" and collects authorities in support of that characterization only discusses limitations in the charter or bylaws, not in private stockholder-level agreements. Welch & Saunders, *supra*, at 858-59, 865. The differences between how a stockholder-level agreement and a charter provision can affect Section 220 rights is another manifestation of the more general distinction Delaware law draws between restrictions on stockholder-level rights in stockholder-level agreements and restrictions in the charter or bylaws. *See* Part II.D.3.b, *supra*.

are facially invalid. A strong argument exists that a broad, unspecified waiver is facially invalid, such as a covenant not to assert any claims for breach of fiduciary duty under any facts. A narrow and targeted provision like the Covenant, however, is not facially invalid.

But that conclusion does not end the analysis, because the justices in *Manti* also considered a case-specific factors when determining that the Refrain Obligation was not contrary to public policy. Their reasoning indicates that in an as-applied challenge, a court can consider (i) the presence of the provision in a bargained-for contract, (ii) the clarity and specificity of the provision, (iii) the stockholder's level of knowledge about the provision and the surrounding circumstances, (iv) the stockholder's ability to foresee the consequences of the provision, (v) the stockholder's ability to reject the provision, (vi) the stockholders' level of sophistication, and (vii) the involvement of counsel. Those factors are necessarily illustrative and not exclusive.

The factors that the *Manti* majority considered all relate to whether it was reasonable to enforce the Refrain Obligation on the facts of the case. The *Manti* decision thus indicates that to survive an as-applied challenge, the party seeking to enforce a waiver must convince the court that the waiver is reasonable.[276]

---

[276] Lawyers should be familiar with that type of requirement. As with other agency agreements, a lawyer's engagement letter can authorize a lawyer to represent a client notwithstanding a conflict of interest that otherwise would constitute a breach of duty. Restatement (Third) of the Law Governing Lawyers § 122 (Am. L. Inst. 2000), Westlaw (database updated Mar. 2023). Each affected client or former client must give informed consent, the representation cannot be prohibited by law, and the conflict cannot involve one client against the other in the same litigation. *Id.* But even where those requirements are met, the waiver must be reasonable, meaning it is ineffective if "in the circumstances,

### b. The *Manti* Dissent

One justice dissented in *Manti* and would have invalidated the Refrain Obligation. The dissent cited (i) ambiguity in the Refrain Obligation,[277] (ii) a mismatch between when the Refrain Obligation terminated and the operation of the appraisal statute,[278] (iii) the presence of the Refrain Obligation in a stockholder-level agreement rather than in the corporation's constitutive documents,[279] (iv) concern about permitting common

---

it is not reasonably likely that the lawyer will be able to provide adequate representation to one or more of the clients." *Id.* "In general, if a reasonable and disinterested lawyer would conclude that one or more of the affected clients could not consent to the conflicted representation because the representation would likely fall short in either respect, the conflict is nonconsentable." *Id.* cmt. g(iv). The *Restatement* also explains that the validity of a waiver of future conflicts turns on its breadth and the surrounding circumstances:

> Client consent to conflicts that might arise in the future is subject to special scrutiny, particularly if the consent is general. A client's open-ended agreement to consent to all conflicts normally should be ineffective unless the client possesses sophistication in the matter in question and has had the opportunity to receive independent legal advice about the consent. . . . On the other hand, particularly in a continuing client-lawyer relationship in which the lawyer is expected to act on behalf of the client without a new engagement for each matter, the gains to both lawyer and client from a system of advance consent to defined future conflicts might be substantial. A client might, for example, give informed consent in advance to types of conflicts that are familiar to the client. Such an agreement could effectively protect the client's interest while assuring that the lawyer did not undertake a potentially disqualifying representation.

*Id.* cmt. d.

[277] 261 A.3d at 1235 (Valihura, J., dissenting).

[278] *Id.* at 1234.

[279] *Id.* at 1237–41.

115

stockholders to waive appraisal rights,[280] (v) concern that permitting waivers of appraisal rights and other mandatory statutory provisions in stockholder agreements "would transform the corporate governance documents into gap-filling defaults and collapse the distinction between a corporation and alternative entities,"[281] and (vi) a view that appraisal rights are a mandatory, non-waivable feature of Delaware corporate law because of their historical role in protecting minority stockholders from underpriced transactions.[282]

The dissent argued convincingly that the Refrain Obligation was ineffective because a drafting bust caused the obligation to terminate before the time came to exercise or waive appraisal rights.[283] The dissent also raised an important concern about "stealth" corporate governance arrangements in which significant stockholders enter into stockholder-level agreements governing the exercise of their rights without other stockholders knowing about the agreements or their implications.[284] This decision differs only in the response to that concern: It proposes disclosure rather than invalidity.

Otherwise, the dissent took the other side of the arguments considered by the majority. The dissent provided an additional spur for this decision's extensive engagement

---

[280] *Id.* at 1241–42.

[281] *Id.* at 1243.

[282] *Id.* at 1243–49.

[283] *See id.* at 1233–34.

[284] *Id.* at 1241.

116

with traditional fiduciary principles, the DGCL, the Delaware common law, and contractarian principles. Only after conducting that analysis has this decision concluded that the Covenant is not facially invalid.

## F. The *Altor Bioscience* Decision

Although the parties did not cite it, a Delaware decision has addressed the validity of a covenant in which stockholders agreed not to assert claims for breach of fiduciary duty.[285] In the *Altor Bioscience* case, Vice Chancellor Slights held that a bargained-for covenant not to sue barred claims for breach of fiduciary duty comparable to the Sale Counts. He rejected the plaintiffs' contention that the covenant was invalid.

Altor Bioscience was a privately held company that was sold to an acquirer. Two stockholders and former directors (Gray and Waldman) asserted claims for breach of fiduciary duty against the fiduciaries who approved the deal. The defendants relied on letter agreements that Gray and Waldman had signed "to broker a 'peace in the valley,' in the midst of great tension between two factions of the Altor board."[286] Under the letter

---

[285] *In re Altor Bioscience Corp.*, C.A. No. 2017-0466-JRS (Del. Ch. May 15, 2019) (TRANSCRIPT); *see* Juris. Subcomm. Ann. Surv. Working Gp., Priv. Equity & Venture Cap. Comm., ABA Bus. L. Section, *Annual Survey of Judicial Developments Pertaining to Private Equity and Venture Capital*, 76 Bus. Law. 237, 247–49 (2021) (discussing *Altor Bioscience*). The parties also did not cite two decisions applying New York law—a similarly contractarian jurisdiction—that relied on covenants not to sue to bar claims for breach of fiduciary duty. *E.g.*, *In re Empire State Bldg. Assocs. L.L.C. Participant Litig.*, 133 A.D.3d 538, 538 (N.Y. App. Div. 2015); *Hugar v. Damon & Morey LLP*, 51 A.D.3d 1387, 1388 (N.Y. App. Div. 2008). Although the legal principle is the same, the facts are not analogous.

[286] *Altor Bioscience*, tr. at 9.

117

agreements, Gray and Waldman resigned from the board and received options and other consideration. In Section 7 of the agreements, Gray and Waldman covenanted that for a period of five years, they would not "directly or indirectly commence, prosecute or cause to be commenced or prosecuted against any Company Releasee any action or other proceeding of any nature before any court, tribunal, Governmental Authority or other body, except for the Company's breach of this letter agreement."[287] Vice Chancellor Slights held that this provision was "tantamount to a covenant not to sue" that had been "offered in exchange for valuable consideration" and was enforceable in accordance with its plain and unambiguous terms.[288]

Gray and Waldman argued that the covenant not to sue was invalid as a matter of public policy because it extinguished claims for breach of the duty of loyalty. In rejecting that argument, Vice Chancellor Slights distinguished between a covenant not to sue that only binds the signatories and a charter provision that purports to limit or eliminate fiduciary duties generally or that seeks to limit or eliminate liability for the duty of loyalty. He explained that a covenant not to sue does not modify either the underlying duty or the availability of a remedy; it only constitutes a commitment by the signatories not to assert the claim.

---

[287] *Id.* at 10.

[288] *Id.* at 13–14.

Vice Chancellor Slights next considered when a covenant might nevertheless operate constructively to limit or eliminate fiduciary duties or the ability to recover damages for a loyalty breach. Relying on *Yucaipa American Alliance Fund I, L.P. v. SBDRE, LLC*,[289] he distinguished between a case where all stockholders are signatories, such that no one can sue, and a situation where "others not bound by the contract could bring suit."[290] He concluded that as long as other parties could assert the claim and provide accountability, then the covenant did not constructively limit or eliminate fiduciary duties or the ability to recover damages for a loyalty breach. In *Altor Bioscience*, there were other stockholders who could sue, so Vice Chancellor Slights held that the provision "does not violate public policy, nor is it otherwise offensive to law or equity."[291] Vice Chancellor Slights therefore entered judgment as a matter of law dismissing the claims for breach of fiduciary duty that Gray and Waldman had tried to assert.

The ruling in *Altor Bioscience* anticipates the majority opinion in *Manti* by declining to hold the covenant facially invalid and instead carefully analyzing whether it was reasonable to enforce the provision. For purposes of a facial challenge, Vice Chancellor Slights noted that the provision did not limit or eliminate the defendants' fiduciary duties or their liability for breach. The provision only bound the signatories and prevented them

---

[289] 2014 WL 5509787, at *15 (Del. Ch. Oct. 31, 2014).

[290] *Altor Bioscience*, tr. at 16.

[291] *Id.* at 15.

119

from filing suit. For purposes of the as-applied challenge, Vice Chancellor Slights noted that Gray and Waldman had agreed to the provision to secure a result they desired—peace in the valley—and they accepted consideration in exchange for the agreement that contained the covenant. By filing suit, they were doing precisely what they had agreed in writing not to do.

The discussion of whether other stockholders could sue should be viewed as part of the overarching reasonableness analysis. A critic might interpret the *Altor Bioscience* ruling as establishing a "Rule of One," under which if at least one other stockholder could sue, then a covenant would be valid. That would be a caricature. Vice Chancellor Slights considered the extent to which other stockholders could sue. The existence of a single stockholder who could assert a claim would not render a provision reasonable. The *Altor Bioscience* ruling supports evaluating a provision like the Covenant for its reasonableness.

## G. The Case-By-Case Analysis Contemplated By *Manti* And *Altor Bioscience*

The decisions in *Manti* and *Altor Bioscience* point to a two-step analysis for a provision like the Covenant. First, the provision must be narrowly tailored to address a specific transaction that otherwise would constitute a breach of fiduciary duty. The level of specificity must compare favorably with what would pass muster for advance authorization in a trust or agency agreement, advance renunciation of a corporate opportunity under Section 122(17), or advance ratification of an interested transaction like self-interested director compensation. If the provision is not sufficiently specific, then it is facially invalid.

120

As this decision has explained, the Covenant meets that standard. It only applies to one of three types of transactions that qualify as a Sale of the Company. The terms of the transaction must then meet the eight specific criteria necessary to qualify as a Drag-Along Sale.[292] The provision is sufficiently specific to avoid facial invalidity.

Next, the provision must survive close scrutiny for reasonableness. In this case, many of the non-exclusive factors suggested in *Manti* point to the provision being reasonable. Those factors include (i) a written contract formed through actual consent, (ii) a clear provision, (iii) knowledgeable stockholders who understood the provision's implications, (iv) the Funds' ability to reject the provision, and (v) the presence of bargained-for consideration.

First, the Covenant is an express provision that appears in the Voting Agreement. The Funds executed that contract and agreed to its terms. The Covenant did not appear as a take-it-or-leave-it provision in a pre-IPO charter. Nor was the Covenant imposed through a midstream charter amendment that the Funds voted against. The Funds freely promised in a written agreement that they would not sue over the Drag-Along Sale. For the Funds to disclaim their written promise makes them "liar[s] in the most inexcusable of commercial circumstances: in a freely negotiated written contract."[293]

---

[292] *See* Part II.B, *supra*.

[293] *Abry*, 891 A.2d at 1058.

Second, the Covenant is clearly written. No one argues that it does not cover the Sale Counts or the defendants.

Third, the Funds are sophisticated repeat players. They necessarily understood the implications of the Covenant, which tracks language in the NVCA's model voting agreement. Discovery might well show that the Funds or their sponsors have deployed comparable provisions to their benefit in other transactions.

Fourth, the Funds could have rejected the Covenant. As the Company's largest incumbent investors and holders of preferred stock, the Funds could have blocked the Recapitalization and forced the Company to seek a different deal. Or they could have proposed a deal of their own. They could have declined to sign the Voting Agreement. And if they thought that Rich had extracted favorable terms, they could have participated in the Recapitalization as investors. Instead, they declined to invest with Rich and his group, signed the Voting Agreement, and let Rich and his group take the risk.

Fifth, the Funds agreed to the Covenant to induce Rich and his fellow investors to fund the Recapitalization. The Covenant affects Rich's ability to exit, and without it, he might not have led the Recapitalization or could have demanded different terms. Invalidating the Covenant changes the bargained-for exchange and shifts value to the Funds by permitting them to pursue rights that they gave up. After the Recapitalization, Rich, Rutchik, and Stella served on the Board and approved the Drag-Along Sale. Invalidating the Covenant changes their litigation exposure as well.

122

The facts of this case provide an example of sophisticated parties using a provision like the Covenant to allocate risk and order their affairs. This is a case where a provision like the Covenant can be enforced.

Although this decision upholds the Covenant against both facial and as-applied challenges, that does not mean that provisions of this sort will be upheld on different facts.[294] Another powerful provision that Delaware courts review for reasonableness is a covenant not to compete. Parties can use covenants not to compete and other restrictive covenants to create value and facilitate commercial relationships. Yet sophisticated parties can also use restrictive covenants to take advantage of the less privileged. Humans are vulnerable to recurring psychological blind spots, including excessively discounting the future. Unless the party bargaining over a restrictive covenant is a repeat player, it is easy to underestimate the future impact of the provision, particularly compared to a concrete job offer. Restrictive covenants frequently appear in situations where meaningful bargaining is absent, such as standardized employment agreements. Restrictive covenants can also appear in unexpected places, like equity grants.

A restrictive covenant affects an important economic right: the ability to work. A covenant not to sue affects a foundational civil right: the ability to access the courts. That

---

[294] The Covenant might not even be upheld against Signatories other than the Funds. The record does not reveal much about them, but judging from their names and hints elsewhere in the record, some might be sophisticated investors, some could be Company executives, some look like line employees, and some look like friends and family. Whether the Covenant could bind them is a different question that could require discovery to answer.

right is foundational because it is necessary to protect all others. Without the ability to obtain a judgment from a court, backed by the power of the state, other rights become meaningless. Unless the holder of the right has some other source of leverage, like influence, economic power, or a willingness to deploy extra-legal force, then the counterparty can ignore the right. Without courts to enforce them, even voting rights can become nullities. In a civil society, what renders a right meaningful is access to the courts and, with a judgment in hand, the power of the state. A forward-looking covenant not to sue warrants greater scrutiny for reasonableness than a covenant not to compete precisely because it limits access to the courts.

A court only decides the case at hand.[295] Nevertheless, it is easy to envision scenarios the proponent of a provision like the Covenant would face deep skepticism and a steep uphill slog. They could include:

- An agreement binding a retail stockholder.

- An employee stock grant.

- A dividend reinvestment plan.

- An employee stock compensation plan.

- A stock transmittal letter.

---

[295] *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 142 n.28 (Del. 1997) ("Those issues are not before us, and we decide only the case before us."); *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 (Del. 1994) ("It is the nature of the judicial process that we decide only the case before us . . . ."); *Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 480 (Del. 1989) ("The law is well settled that our courts will not . . . render advisory opinions.") (internal quotation omitted).

- A transaction that offered an election between base consideration and incremental consideration plus a covenant not to sue. [296]

There may well be other use cases for a provision like the Covenant, but they are likely to be few and limited to agreements between *uber*-sophisticated parties like the Rich Entities and the Funds.

## H. A Public Policy Limitation From Contract Law

Although the Covenant is not invalid as a form of impermissible fiduciary tailoring, there is one remaining limitation on what the Covenant can accomplish. As a general matter, "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."[297] Thus, "[a]n attempted exemption from liability for a future intentional tort . . . is generally held void . . . ."[298] Delaware decisions addressing exculpatory provisions in commercial agreements have applied this rule, stating: "A party may not protect itself against liability for its own fraudulent act or bad faith. Even if a contract purports to give a general exoneration from

---

[296] The Court of Chancery has refused to enforce a release in a transmittal letter for lack of consideration. *Cigna Health & Life Ins. Co. v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1091 (Del. Ch. 2014). Incremental consideration for a covenant not to sue would solve the consideration problem. The public policy problem would remain.

[297] Restatement (Second) of Contracts § 195 (Am. L. Inst. 1981), Westlaw (database updated Oct. 2022).

[298] Richard A. Lord, 8 *Williston on Contracts* § 19:24 (4th ed. 2007), Westlaw (database updated May 2022).

'damages,' it will not protect a party from a claim involving its own fraud or bad faith."[299] A commercial agreement among sophisticated parties can only exonerate a party for liability for its own negligence.[300]

But as with many things in the law, the public policy line is blurred. There is one area where Delaware law has reached beyond the traditional limitations on contracting by providing a path for sophisticated parties to cabin liability for an intentional tort. In *Abry Partners*, Chief Justice Strine held while serving as a member of this court that sophisticated parties, bargaining at arm's length and with the ability to walk away freely, could enter into an acquisition agreement that expressly disclaimed reliance on any representations made outside of the agreement, thereby preventing those representations from supporting a fraud claim.[301] The Chief Justice acknowledged that this outcome departed from the rule in the Restatement (Second) of Contracts and the law of other states, but he emphasized the importance that Delaware law places on the freedom of contract and "the ability of sophisticated businesses, such as the Buyer and Seller, to make their own

---

[299] *J. A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 545 (Del. Super. Ct. 1977) (citation omitted); *accord Fort Howard Cup Corp. v. Quality Kitchen Corp.*, 1992 WL 207276, at *5 (Del. Super. Ct. Aug. 17, 1992).

[300] *Data Mgmt. Internationale, Inc. v. Saraga*, 2007 WL 2142848, at *5 (Del. Super. Ct. July 25, 2007).

[301] *See Abry*, 891 A.2d at 1062.

judgments about the risk they should bear and the due diligence they undertake, recognizing that such parties are able to price factors such as limits on liability."[302]

Technically, the *Abry Partners* decision does not limit liability for fraud, but rather specifies the information on which a fraud claim can be based, which indirectly constrains liability for fraud. In substance, the party providing the anti-reliance representation covenants not to sue over any statements outside of the agreement. So viewed, *Abry Partners* authorizes a covenant not to sue that addresses an intentional tort. To date, Delaware decisions have declined to expand the *Abry Partners* principle beyond anti-reliance provisions, holding that other attempts to limit liability for fraud violate public policy.[303] That trend suggests that *Abry Partners* should not be used to validate other provisions that seek to eliminate tort liability for intentional harm.

Recklessness is a different matter. As discussed previously, Section 102(b)(7) of the DGCL authorizes exculpation for monetary liability for the duty of care, and Delaware decisions interpreting Section 102(b)(7) hold that the reckless conduct falls within the

---

[302] *Id.* at 1061.

[303] *See Fortis Advisors LLC v. Johnson & Johnson*, 2021 WL 5893997, at *11 (Del. Ch. Dec. 13, 2021) (exclusive remedy provision); *Online HealthNow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *16–18 (Del. Ch. Aug. 12, 2021) (provision limiting survival of representations); *id.* at *19–20 (non-recourse provision); *FdG Logistics LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842, 860 (Del. Ch. 2016) (representation by seller that no extracontractual statements were made in lieu of agreement by buyer disclaiming reliance on extracontractual statements), *aff'd* 148 A.3d 1171 (Del. 2016); *Abry*, 891 A.2d at 1064 (damages cap).

ambit of the duty of care.[304] Making recklessness subject to exculpation also tracks the scope of indemnifiable conduct under Section 145(a) and insurable conduct under Section 145(g). Section 145(a) authorizes indemnification as long as the fiduciary acted in subjective good faith and reasonably believed that the decision was not opposed to the interests of the corporation. Section 145(g) authorizes a corporation to use a captive insurer to protect against fiduciary liability for any claim except (i) personal profit or other financial advantage to which such person was not legally entitled or (ii) deliberate criminal or deliberate fraudulent act of such person, or a knowing violation of law by such person.[305] Both standards encompass recklessness.

A claim for breach of fiduciary duty is an equitable tort.[306] To the extent the Covenant seeks to prevent the Funds from asserting a claim for an intentional breach of fiduciary duty, then the Covenant is invalid—not as an impermissible form of fiduciary tailoring, but because of policy limitations on contracting.

Otherwise, the Covenant bars challenges to the Drag-Along Sale. Thus, if the defendants engaged in self-interested transactions but believed in good faith that the

---

[304] *See* Part II.D.2, *supra*.

[305] *See* Part II.D.2.a.v, *supra*.

[306] *Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort."); *see also* Restatement (Second) of Torts § 874 cmt. b (Am. L. Inst. 1979), Westlaw (database updated Mar. 2023) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct . . . ."). *See generally* J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty and the Delaware Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010).

transactions were not contrary to the best interests of the Company, then the Covenant forecloses those claims. The Covenant also forecloses claims that the defendants engaged in the self-interested transactions with reckless disregard for the best interests of the Company.

As discussed in the Pleading Decision, the Sale Counts could support liability for a bad faith breach of duty.[307] Damages for that claim would result from an intentional tort. The Covenant therefore cannot bar the Sale Counts in their entirety.

## III.    CONCLUSION

The Covenant is not facially invalid as a prohibited form of fiduciary tailoring. The Covenant operates permissibly within the space for fiduciary tailoring that Delaware corporate law provides, particularly in a stockholder-level agreement that only addresses stockholder-level rights.

The Covenant is not unreasonable on the facts of this case. Sophisticated repeat players consented explicitly to a clear provision in a stockholder-level agreement that applies only to a specific transaction.

Nevertheless, the Covenant cannot relieve the defendants of tort liability for intentional harm. The Sale Counts could support that form of liability. The Covenant therefore does not foreclose the Sale Counts, and the defendants' motion to dismiss those counts based on the Covenant is denied.

---

[307] 2023 WL 2417271, at *45.

129